THE STATE OF OHIO, APPELLEE, *v.* MONROE, APPELLANT.

[Cite as *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282.]

(No. 2002–2241—Submitted February 1, 2005—Decided May 25, 2005.)

LUNDBERG STRATTON, J.

{¶ 1} In the early morning of April 17, 1996, Travinna Simmons and Deccarla Quincy were murdered in Quincy's apartment on Columbus's east side. Four years later, the Cold Case Unit of the Columbus Police Homicide Department obtained evidence implicating Shannon Boyd and defendant-appellant, Jonathon Monroe, in the double homicide. Monroe was found guilty of murdering Simmons and Quincy and was sentenced to death. This is Monroe's appeal.

{¶ 2} In 1996, Shannon Boyd had known Monroe for a few years and had sold drugs with him. According to Boyd, on April 16, 1996, Monroe phoned Boyd and asked him if he wanted "to take a ride." Monroe picked Boyd up and told him he had to meet someone on the east side of Columbus. They then drove to the Classic Lounge.

{¶ 3} Boyd later testified that inside the lounge, Monroe began talking to Deccarla Quincy and Travinna Simmons, whom Boyd described as flirtatious. The women invited Boyd and Monroe to smoke marijuana with them, and they all agreed to meet at Quincy's apartment nearby. Federal authorities were watching Quincy's apartment because the women were reputed to be dealers in large quantities of drugs.

{¶ 4} According to Boyd, he and Monroe got into Monroe's car, and Monroe told Boyd that he planned to smoke marijuana with the women and have them call their friends. He told Boyd that while Boyd stayed with the women, he would ride around with the women's friends, rob them, and then come back to get Boyd and act as if nothing had happened. But Boyd refused to go along with the plan, and when Monroe tried to give him a gun, Boyd refused that, too. Monroe shoved the gun under his driver's seat and told Boyd: "Quit being a pussy."

{¶ 5} Monroe and Boyd exited the car and followed the women into Quincy's third-floor apartment. Boyd noticed that the cigars in Quincy's apartment were not the type he preferred for making marijuana cigars, so he went back to Monroe's car to retrieve his own cigars. When Boyd reentered Quincy's apart-

ment, Simmons and Quincy were sitting on a couch, and Monroe was standing in front of them holding a gun. The gun was different from the one Monroe had showed Boyd earlier. Boyd told Monroe that he did not want to go along with what Monroe was doing. Monroe pointed the gun at Boyd and asked him, "Do you want to die?" When Boyd replied no, Monroe told him to shut the door and do what he said.

{¶ 6} Boyd stated that Monroe gave him a pair of yellow latex dishwashing gloves to put on. Monroe then told Boyd to tape the women's hands and ankles with clear packing tape that was on a table in the apartment. While Boyd taped the ankles and wrists of the woman he referred to as the "big girl" (Simmons), one of the glove's fingertips came off after getting stuck on the tape. When Boyd began taping the ankles of the "smaller girl" (Quincy), Monroe told Boyd he was doing it wrong and told him to get a knife from the kitchen. Monroe taped Quincy's ankles and then began asking the women where the drugs and money were. The women repeatedly denied having any. Monroe took the knife Boyd had brought from the kitchen and began poking the women with it, asking them where the drugs were. When the women denied having any drugs, Monroe stabbed them. Monroe then told Boyd to separate the women. Boyd grabbed Simmons and dragged her into a bedroom.

{¶ 7} According to Boyd, Monroe put Simmons in a headlock while demanding drugs and money and stabbed her in the chest when she said that she and Quincy did not have any. Monroe put Simmons on a bed, then picked up Quincy from the couch and carried her into another bedroom. Boyd then panicked and ran out of the apartment and down the outside stairwell.

{¶ 8} Monroe later told a cellmate that after Boyd ran away, Monroe "went ahead and dumped them in the head," meaning he shot both women in the head. Boyd heard gunshots when he was at the bottom of the stairwell. He then ran to a nearby gas station, where he called a cab.

{¶ 9} Bennett and Patricia Wise lived in the apartment below Quincy's. Bennett was awakened by the scuffling and screaming coming from Quincy's apartment. Patricia, who was in the living room talking on the phone, also heard screaming and scuffling. She called 911. Patricia and Bennett heard someone running down the apartment-complex stairwell, and Bennett looked out from a window and saw a thin man wearing a greenish-yellow jacket running "real fast" from the apartment stairwell. Bennett recalled hearing "maybe four" gunshots. After the shots were fired, he saw a shorter, stocky, heavy man with a "mini-afro" run from the apartment stairwell with a gun in his hand. Other witnesses described Monroe as having been heavyset at the time of the murders.

{¶ 10} Patricia also looked out the apartment window during the commotion. She first saw a young, tall, thin man run out wearing what she described as a

"bright lined yellow jacket." Shots were still being fired in the apartment above when she saw the first man. After the first man fled the scene, Patricia saw a stocky black man come out of the stairwell. Patricia recalled that all the shots were fired from the apartment above. She estimated that seven or eight shots were fired.

{¶ 11} Columbus Police arrived on the scene shortly thereafter and found the bodies of Simmons and Quincy. The apartment appeared to have been ransacked. Shell casings found in Quincy's apartment indicated that the women had been shot with a nine-millimeter firearm. Also found at the crime scene were pieces from a yellow rubber glove. Police collected blood from the front door of Quincy's apartment.

{¶ 12} Although both women had suffered several sharp-instrument wounds, the coroner attributed Quincy's death to a gunshot wound to the head and Simmons's death to multiple gunshot wounds, including a fatal gunshot wound to her head.

{¶ 13} The murders remained unsolved for several years. In January 2000, Detective Richard Bisutti of the Columbus Police Cold Case Unit was assigned the case. He had information that Monroe had been scheduled to make a drug transaction with one of the victims on the day of the homicides. The detectives began viewing Monroe as a suspect in the slayings after blood samples they obtained from him matched blood recovered from the crime scene.

{¶ 14} During the fall of 2000, Boyd implicated Monroe in the murders and made a plea bargain with the prosecutor to plead guilty to two counts of involuntary manslaughter in exchange for his testimony against Monroe. Charles White, who shared a cell with Monroe in the county jail in November 2001, also implicated Monroe based on conversations he had with Monroe while they were incarcerated together.

{¶ 15} Mark Hardy, a firearms examiner, concluded that the casings recovered at the scene, as well as bullets recovered from the two murder victims, were fired from a nine-millimeter firearm, likely a semiautomatic pistol. Hardy found that three different brands of ammunition were used in the slayings; however, no evidence suggested that more than one weapon was involved.

{¶ 16} Lynn Bolin, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI") specializing in DNA analysis, testified that blood found on the front door of Quincy's apartment was a mixture from various sources. The major DNA profile found in the mixture was consistent with Monroe's. Although the two victims could not be excluded as minor contributors to the mixture found on the apartment door, Boyd was excluded as a contributor. Bolin opined that Monroe could not be excluded as the source of the major DNA profile of the blood. The profile found occurs in one in every 29.140 quadrillion in

the Caucasian population, one in every 2.336 quadrillion in the African–American population, and one in every 1.538 quadrillion in the Hispanic population.

{¶ 17} In April 2001, a grand jury indicted Monroe on eight counts of aggravated murder for the killings of Quincy and Simmons. Each count included a firearms specification and four death-penalty specifications: murder in connection with (1) an aggravated burglary, (2) an aggravated robbery, and (3) kidnapping (R.C. 2929.04[A][7] ), and (4) murder as part of a course of conduct involving the killing of two persons (R.C. 2929.04[A][5] ). Monroe was also indicted on one count of aggravated burglary, two counts of aggravated robbery, and two counts of kidnapping.

{¶ 18} During a jury trial, the state presented a number of witnesses, including Boyd. Monroe presented three defense witnesses, including Boyd and White. Defense witness Nathaniel Gilmore, who had lived with Boyd after the murders, testified that Boyd had told him that he murdered the two women and had never mentioned that anyone was with him. White testified that when he and Boyd were in jail, Boyd told him that he and Monroe had stabbed and shot the two victims. When another inmate expressed disbelief that Boyd could ever stab or shoot anyone, Boyd revised his story and said that Monroe was the one who had stabbed and shot the two women. When called by the defense, Boyd denied ever having talked to Gilmore about the murders and denied telling White that he had stabbed the victims. The trial court gave a limiting instruction to the jury that the testimony by Gilmore and White regarding what Boyd had told them was admitted solely to test the credibility of Boyd and was not to be considered for any other purpose.

{¶ 19} After deliberation, the jury found Monroe guilty as charged. At the conclusion of the penalty phase, the jury recommended death, and the trial court imposed the death sentence.

I

TRIAL ISSUES

*Gruesome Photographs*

{¶ 20} In propositions of law II, V, and VIII, Monroe claims that the trial court erred in admitting gruesome photographs during both phases of trial.

{¶ 21} Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916; *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 473 N.E.2d 768. Nonrepetitive photographs in a capital case, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material preju-

dice to the accused. *Maurer,* paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267.

{¶ 22} In proposition of law II, Monroe contends that many of the photos admitted in both phases of trial depicting the crime scene and the two victims at the morgue were gruesome and repetitive and deprived him of a fair trial and fair sentencing determination. Monroe asserts that the sheer number of photographs admitted, over 200, rendered them repetitive and cumulative.

{¶ 23} The defense filed a motion in limine to exclude all photos of the victims. Prior to voir dire, the parties discussed the motion with the trial court, and the defense then specifically objected to State's Exhibit M–20, a morgue photo depicting a gaping cut on Quincy's neck. The trial court overruled the objection and stated that although the photo was gruesome, it was the only photo showing that particular wound.

{¶ 24} At the close of the state's case, the prosecutor moved to admit State's Exhibits M (morgue photos of Quincy), N (morgue photos of Simmons), and P (crime-scene photos). The prosecutor noted that out of the 24 photos constituting State's Exhibit M, the court had excluded nine as too gruesome. Of the 18 morgue photos of Simmons included in State's Exhibit N, the court excluded six.

{¶ 25} Monroe failed to object to the admission of any of the remaining photos, except for State's Exhibit M–20, and has therefore waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Yet Monroe fails to demonstrate plain error in the admission of any of the photos in issue. We have reviewed all of these photos and hold that there was no plain error in admitting them.

{¶ 26} We hold that all of these photos were relevant and helped to prove the killer's intent and the lack of accident or mistake and illustrated the testimony of the detectives who described the crime scene and the coroner who described the wounds and injuries sustained by the two murder victims. These photos gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. Moreover, reversal is not required merely because a large number of photos were admitted. *State v. Smith,* 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 35.

{¶ 27} Here, the trial court reviewed all the photographs submitted by the state and removed those photos that it considered overly gruesome or repetitive or cumulative. In so doing, the trial court exercised its discretion in admitting the photos. See, e.g., *State v. Davie* (1997), 80 Ohio St.3d 311, 318, 686 N.E.2d 245; *State v. Franklin,* 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 23. We find no outcome-determinative plain error in the admission of these photos. Moreover, with respect to the one photograph Monroe did object to (the morgue

photo showing the cut on Quincy's neck), we find that its probative value outweighed any prejudice to Monroe.

{¶ 28} In proposition of law V, Monroe argues that his counsel were ineffective for failing to object to the admission of the photographs during the guilt phase. Monroe objects to the same photos (State's Exhibits M, N, and P) as repetitive that he objected to in proposition of law II.

{¶ 29} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. However, in no instance does Monroe demonstrate prejudice, i.e., "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus. Given that the trial court reviewed the photographs—removing those it believed to be overly gruesome or repetitive—counsel were not ineffective for failing to object to the photos admitted.

{¶ 30} In proposition of law VIII, Monroe contends that the trial court erred in admitting gruesome photographs in the penalty phase over defense counsel's objection.

{¶ 31} Yet we have uniformly held that a trial court may properly allow repetition of much or all that occurred in the guilt phase, pursuant to R.C. 2929.03(D)(1). See, e.g., *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542; *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 73. Exhibits from the guilt phase are relevant to the death-penalty specifications and to the nature and circumstances of the offense. *State v. Mason* (1998), 82 Ohio St.3d 144, 165, 694 N.E.2d 932; *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75.

{¶ 32} Here, the trial court noted the defense's objection to the admission of the photographs that had been admitted in the guilt phase and reviewed the photos again. As a result, the trial court excluded three gruesome photos from the penalty phase: State's Exhibits N–2, N–3, and M–20. Given the trial court's renewed scrutiny of the photos at the close of the penalty phase, Monroe's claim of error is not persuasive.

{¶ 33} Accordingly, propositions II, V, and VIII are not well taken.

### *Guilt–Phase Jury Instructions*

{¶ 34} In proposition of law III, Monroe asserts that the trial court abused its discretion in refusing to instruct the jury on the lesser included offenses of murder and involuntary manslaughter, as requested by defense counsel. Monroe

contends that the jury could have believed that Boyd exaggerated his story or could have chosen not to believe the parts of Boyd's testimony bearing upon prior calculation and design. According to Monroe, the jury had good reason to disbelieve Boyd's testimony, because the defense called two acquaintances of Boyd's, Nathaniel Gilmore and Charles White, who testified that Boyd had told them that he was the killer.

{¶ 35} We note that only two of the eight aggravated-murder counts (Counts 1 and 2) against Monroe alleged prior calculation and design. The remaining six aggravated-murder counts were felony-murder counts. Thus, even if we were to accept Monroe's argument, only those two aggravated-murder counts would be affected. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 338, 738 N.E.2d 1178.

{¶ 36} Murder (R.C. 2903.02) is a lesser included offense of aggravated murder (R.C. 2903.01[A] ). *State v. Mason*, 82 Ohio St.3d at 161, 694 N.E.2d 932. The sole difference is that prior calculation and design is absent from murder. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 345, 703 N.E.2d 1251. Involuntary manslaughter (R.C. 2903.04) is also a lesser included offense of aggravated murder (R.C. 2903.01[A] ). *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus. The primary difference is that aggravated murder requires a purpose to kill, while involuntary manslaughter requires only that a killing occur as a proximate result of committing or attempting to commit a felony. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 218, 15 OBR 311, 473 N.E.2d 264.

{¶ 37} However, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the trial court must view the evidence in the light most favorable to the defendant. *State v. Campbell* (1994), 69 Ohio St.3d 38, 47–48, 630 N.E.2d 339. When the evidence presented at trial does not meet this test, a charge on the lesser included offense is not required. *State v. Kidder* (1987), 32 Ohio St.3d 279, 282–283, 513 N.E.2d 311.

{¶ 38} Here, viewing the evidence in a light most favorable to Monroe, there was no reasonable basis for the jury to find that the element of prior calculation and design was absent. Monroe brought a gun and yellow latex gloves to Quincy's apartment. He tortured the two victims with a knife, inflicting stab wounds to their chests that would have been fatal if not treated. He moved the women to different rooms. He inflicted a fatal gunshot wound to Quincy's head and several fatal gunshot wounds to Simmons's head and body. His actions

occurred over a period of time and were not the result of a sudden decision. Therefore, we hold that an instruction on murder was not warranted.

{¶ 39} The evidence of prior calculation and design presented in this case was, in our view, stronger than the evidence in *State v. Goodwin,* 84 Ohio St.3d 331, 703 N.E.2d 1251. In *Goodwin,* we held that the trial court correctly refused to give a requested instruction on murder in a case involving one victim killed during the robbery of a store. In that case, we held that putting the murder weapon to the forehead of the cooperative, unresisting victim and firing the weapon was sufficient evidence to support the element of prior calculation and design. Id. at 344–345, 703 N.E.2d 1251.

{¶ 40} Monroe argues, however, that the jury could have reasonably concluded that Boyd had lied and that Boyd was the actual killer. Monroe points to testimony from Nathaniel Gilmore and Charles White, who both testified that Boyd had admitted killing the two women. However, the trial court gave a limiting instruction to the jury that that testimony was admitted solely to impeach the credibility of Boyd and was not to be considered for any other purpose.

{¶ 41} Even if the testimony of Gilmore and White had been admitted as evidence that Boyd was the killer, it would not have supported a lesser-included-offense instruction for murder. According to Gilmore, Boyd said that he was the sole killer of the two women and did not say that Monroe or anyone else was with him at the time. Thus, under the version that Boyd allegedly told Gilmore, Monroe would have to be acquitted, since he was not involved in the murders at all. Cf. *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388–389, 18 O.O.3d 528, 415 N.E.2d 303.

{¶ 42} According to White, Boyd told him two different versions of what had happened. Under one version, both Boyd and Monroe stabbed and shot the two women. Under the other version, Boyd fled the scene before the shootings took place. Thus, there was nothing in White's testimony whereby the jury could reasonably conclude that Monroe had acted without prior calculation and design and was guilty only of murder.

{¶ 43} Likewise, there was no evidence whereby the jury could reasonably conclude that Monroe had acted without purpose to kill, which would make him guilty only of the lesser included offense of involuntary manslaughter. The manner in which the victims were killed clearly points to purposeful killings. Both victims were stabbed repeatedly and shot in the head.

{¶ 44} Both Boyd and White testified for the state. Boyd essentially testified that Monroe had wanted to rob the women of drugs and was prepared to kill them, as evidenced by his bringing gloves and a gun to the apartment. According to White's testimony as a prosecution witness, Monroe admitted stabbing the

two women and then shooting them in the head so that he would not leave any witnesses.

{¶ 45} Moreover, even if the testimony from Gilmore and White regarding Boyd's alleged confession had been admitted to prove that Boyd was the killer, it did not portray Monroe as a mere accomplice, lacking a purpose to kill. Under Gilmore's testimony, Monroe was not involved in the killings. Under White's testimony, Monroe was directly involved in both the stabbings and the shootings. Under the evidence admitted at trial, no jury could have reasonably found the absence of a purpose to kill on the part of Monroe. Hence, the trial court properly refused to instruct the jury on involuntary manslaughter. See *State v. Smith* (2000), 89 Ohio St.3d 323, 330–331, 731 N.E.2d 645; *State v. Raglin* (1998), 83 Ohio St.3d 253, 257–258, 699 N.E.2d 482. Accordingly, we reject proposition III.

### *Sufficiency and Manifest Weight of the Evidence*

{¶ 46} In proposition of law IV, Monroe argues that the verdicts in his case were not supported by sufficient evidence and were against the manifest weight of the evidence. Specifically, Monroe asserts that the state failed to prove the element of prior calculation and design.

{¶ 47} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 48} We hold that the evidence in this case was sufficient to establish Monroe's guilt of the crimes and to prove prior calculation and design. The state's evidence showed that Monroe cajoled Boyd to take a ride with him. They drove to a bar on the east side of Columbus where they met up with Quincy and Simmons. The women invited Monroe and Boyd to Quincy's apartment to smoke marijuana. Shortly thereafter, Monroe confided to Boyd that he planned to rob the women's friends.

{¶ 49} At the apartment, Monroe brandished a gun, produced yellow latex gloves, and told Boyd to wear the gloves and bind the women's hands and ankles with packing tape. Monroe rummaged through the apartment looking for drugs. Monroe then ordered Boyd to retrieve a knife from the kitchen. Monroe then stabbed the women with a knife, demanding that they give him drugs. He and

Boyd moved the women to different bedrooms. Boyd panicked and fled the apartment. Monroe then shot both women in the head and fled the scene.

{¶ 50} While in jail with Charles White, Monroe admitted stabbing and shooting both women after they denied having drugs, which Monroe believed were in Quincy's apartment. The DNA profile of blood recovered from the front door of Quincy's apartment was consistent with Monroe's DNA profile. This DNA profile would be found in only one of every 2.336 quadrillion African-Americans.

{¶ 51} Viewing the foregoing evidence in favor of the state, we hold that there was sufficient evidence to support Monroe's convictions for the aggravated burglary, aggravated robbery, kidnapping, and murder with prior calculation and design of both Quincy and Simmons.

{¶ 52} As to the weight of the evidence, the issue is whether "there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis sic.) *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866, citing *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. The evidence we set forth above collectively represents "substantial evidence" and supports the convictions. In our view, the jury did not lose its way, and this is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717; *State v. Nields* (2001), 93 Ohio St.3d 6, 25, 752 N.E.2d 859.

{¶ 53} Accordingly, we overrule proposition IV.

## II

### SENTENCING ISSUES

*Penalty–Phase Jury Instructions*

{¶ 54} In propositions of law IX and X, Monroe argues that the penalty-phase jury instructions denied him a fair trial.

{¶ 55} In proposition IX, Monroe contends that he was prejudiced because the second of three verdict forms submitted to the jury for each of the eight aggravated murder counts stated that a life-imprisonment verdict must be unanimous. Monroe asserts that recommendation of a life sentence need not be unanimous and that the jurors should recommend a life sentence if they are anything other than unanimously in favor of a death verdict. Yet Monroe's failure to object at trial waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. No plain error occurred.

{¶ 56} The second verdict form given to the jury for each of the eight aggravated murder counts provided:

{¶ 57} "We, the Jury, having reached a deadlock on whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, hereby unanimously recommend the following life sentences on Count * * * (check one):

{¶ 58} "___ Life Imprisonment with parole eligibility after 30 full years.

{¶ 59} "___ Life Imprisonment with parole eligibility after 20 full years."

{¶ 60} In *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph ten of the syllabus, we held: "In returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous." Thus, contrary to Monroe's assertion, unanimity is indeed required in order for the jury to return a life sentence.

{¶ 61} Monroe cites *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96, and *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, but neither case supports his argument. In *Springer*, we held that if the jury becomes irreconcilably deadlocked in the penalty phase of a capital trial and is unable to reach a unanimous verdict to recommend any sentence authorized by R.C. 2929.03(C)(2), then the *trial court* is required to impose a life sentence. *Springer* at syllabus. In *Brooks*, we recognized that in Ohio, a solitary juror may prevent a death-penalty recommendation and held that juries from the date of that decision forward should be so instructed. *Brooks* at 162, 661 N.E.2d 1030. Yet *Brooks* also reaffirmed the *Jenkins* standard that the jury must be unanimous in returning a life verdict. Id. "In Ohio, it is required that a verdict of life imprisonment be unanimous, and that requirement has been upheld as constitutional." *State v. Nields*, 93 Ohio St.3d at 30, 752 N.E.2d 859.

{¶ 62} Thus, the second verdict form for each of the aggravated-murder counts accurately reflected Ohio law, and we reject Monroe's argument that a recommendation of a life sentence need not be unanimous.

{¶ 63} In proposition of law X, Monroe claims that the trial court deprived him of a fair trial by using the term "recommendation" throughout voir dire and in its penalty-phase jury instructions when referring to the jury's penalty verdict. Yet, as Monroe concedes, use of the term "recommendation" in a jury instruction accurately reflects Ohio law. *State v. Clemons* (1998), 82 Ohio St.3d 438, 444, 696 N.E.2d 1009; *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965. Moreover, the trial court instructed the jury that the term "recommend" was not intended to "diminish [the jurors'] sense of responsibility in this matter." This instruction was nearly identical to the cautionary instruction we approved in *State v. Robb* (2000), 88 Ohio St.3d 59, 84, 723 N.E.2d 1019. Therefore, we overrule proposition X.

*Merger of Aggravating Circumstances*

{¶ 64} In proposition of law XII, Monroe argues that the trial court erred in failing to merge duplicative aggravating circumstances in the penalty phase.

{¶ 65} Because Monroe failed to request a merger of the aggravated circumstances at trial, he waived all but plain error. *State v. Cook* (1992), 65 Ohio St.3d 516, 528, 605 N.E.2d 70; *State v. Cooey* (1989), 46 Ohio St.3d 20, 39, 544 N.E.2d 895. Moreover, Monroe fails to specify which aggravating circumstances he believes should have been merged.

{¶ 66} There were four aggravating circumstances/death-penalty specifications under each aggravated-murder count: (1) murder in connection with an aggravated burglary, (2) murder in connection with an aggravated robbery, (3) murder in connection with a kidnapping, and (4) murder as a course of conduct involving the purposeful killing of two or more persons. However, as explained below, merger was not required for any of these aggravating circumstances.

{¶ 67} **Aggravated robbery and kidnapping.** Both victims in this case were bound at the hands and ankles with packing tape and were tortured with a knife. According to Boyd, the victims were stabbed because they denied having drugs, which Monroe wanted to steal from them. Given the prolonged torture, along with the fact that the bound victims were dragged into separate bedrooms, it is clear that the kidnappings had significance independent of the aggravated robbery. See *State v. Hartman,* 93 Ohio St.3d at 280–281, 754 N.E.2d 1150. Cf. *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 89–95, and *State v. Fears* (1999), 86 Ohio St.3d 329, 344, 715 N.E.2d 136 (two cases in which we held that the aggravating circumstances of aggravated robbery and kidnapping should have been merged).

{¶ 68} **Aggravated burglary and aggravated robbery.** The aggravated-burglary and aggravated-robbery specifications were also not subject to merger, since they were committed with separate animus. The burglary was complete as soon as Monroe entered the apartment by deception with the intent to commit a theft offense. Monroe then attempted to rob Quincy and Simmons of drugs that Monroe thought were in Quincy's apartment. Thus, the aggravated burglary and aggravated robbery were separate offenses and constituted separate aggravating circumstances because they did not arise from the same act. See *State v. Williams* (1996), 74 Ohio St.3d 569, 580, 660 N.E.2d 724; *State v. Fears,* 86 Ohio St.3d at 344, 715 N.E.2d 136. See, also, *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 12 O.O.3d 263, 389 N.E.2d 1118.

{¶ 69} **Aggravated burglary and kidnapping**. Merger was not required for the aggravated burglary and kidnapping specifications. Aggravated burglary and kidnapping are not allied offenses of similar import. *State v. Waddy* (1992),

63 Ohio St.3d 424, 448, 588 N.E.2d 819; *State v. Fears*, 86 Ohio St.3d at 344, 715 N.E.2d 136.

{¶ 70} **Course of conduct and aggravated burglary, aggravated robbery, and kidnapping.** The course-of-conduct specification involved Monroe's purposeful murder of two persons and is distinctly different from committing murder during an aggravated burglary, aggravated robbery, or kidnapping. No merger of specifications was required. See *State v. Smith* (1997), 80 Ohio St.3d 89, 116, 684 N.E.2d 668 (specifications for multiple murder and for felony murder represent distinct and separate aggravating circumstances).

{¶ 71} The trial court did not commit plain error in failing to merge any of the death-penalty specifications. Therefore, we overrule proposition XII.

## *Waiver of Mitigation*

{¶ 72} In propositions of law VII and XIII, Monroe argues that the trial court erred in how it conducted the penalty phase of Monroe's trial.

{¶ 73} In proposition VII, Monroe asserts that the trial court failed to determine whether he was competent to waive presentation of mitigating evidence. Monroe contends that although he gave an unsworn statement, he addressed the statement to his family in the courtroom and offered nothing to the jury in mitigation. Monroe further contends that the lone witness called to testify on his behalf, Eliza Dillard, had not seen him in over 20 years and could testify only as to his poor upbringing.

{¶ 74} Monroe contends that the trial court failed to adhere to our holding in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231. In *Ashworth*, we held, in paragraph one of the syllabus: "In a capital case, when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) However, *Ashworth* has no applicability. here because Monroe did not waive presentation of *all* mitigating evidence. Given our emphasis in *Ashworth* on the word "all," it is clear that we intended to require an inquiry of a defendant only in those situations where the defendant chooses to present no mitigating evidence whatsoever.

{¶ 75} Moreover, Monroe's claim that he essentially presented no mitigating evidence is not borne out by the record. Regardless of how Monroe characterizes it, he did in fact present mitigating evidence. Eliza Dillard testified about Monroe's upbringing in West Virginia. Dillard stated that Monroe's family suffered a hard life in the early 1980s, and she told of infidelity and other problems in his parents' marriage. She told the jury that Monroe's father eventually left the family.

{¶ 76} Monroe gave an unsworn statement to the jury, and he described the hard life he had had as a child, including the absence of his father, and said that both of his parents had endured abuse during their upbringing. Monroe's unsworn statement was directed at the jury, not his family, as he now claims. For example, Monroe noted near the end of his statement: "Like I said before, I respect all of your decisions and I think that if the evidence is presented to you the way I think it should have been, I don't think I would be sitting here begging for my life now. Well, I'm not begging for my life * * *." Even assuming that Monroe directed his statement at his family, it is clear that his statement was also directed at the jury.

{¶ 77} Monroe also suggests that his family members could have given additional mitigation testimony but cites nothing in the record to support this assertion. In fact, defense counsel informed the trial court that they complied with Monroe's request not to have any of his family testify in his behalf.

{¶ 78} And even if family members had testified in Monroe's behalf, it is not clear that their testimony would have helped Monroe avoid a death sentence. Given that Monroe was already serving a prison term for murder in an unrelated case, a thorough mitigation presentation could have opened the door for the prosecution to introduce evidence of that murder conviction, a fact the defense naturally wanted to keep from the jury.

{¶ 79} As we noted in *State v. Ashworth,* 85 Ohio St.3d at 63, 706 N.E.2d 1231, even if a trial court were to require defense counsel to present mitigating evidence, it could not force an unwilling defendant to provide that evidence to his attorney. Moreover, if a defendant does not want to present mitigating evidence, "no societal interest counterbalances his right to control his own defense." *State v. Tyler* (1990), 50 Ohio St.3d 24, 28, 553 N.E.2d 576.

{¶ 80} Moreover, a capital defendant's decision to forgo mitigation "does not by itself call his competence into question." Id. at 29, 553 N.E.2d 576. "[A]bsent a request by counsel, or any indicia of incompetence, a competency evaluation is not required." *Ashworth,* 85 Ohio St.3d at 62, 706 N.E.2d 1231. A court is required to inquire into a capital defendant's competence only if some reason other than the decision to forgo presentation of mitigation evidence exists that calls into question the defendant's competence. See *State v. Cowans* (1999), 87 Ohio St.3d 68, 82, 717 N.E.2d 298. Neither Monroe's behavior at trial nor his decision to limit the amount of mitigating evidence presented in his behalf provided cause to call his competence into question. Nor did his counsel, who worked with him closely, raise any questions about Monroe's competence. Deference on such issues should be granted to those "who see and hear what goes on in the courtroom." Id. at 84, 717 N.E.2d 298.

{¶ 81} In summary, we hold that Monroe did present mitigating evidence. Therefore, *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, syllabus, does not apply in this case. Monroe's behavior did not raise questions concerning his competence at any time during trial. Therefore, the trial court was not obligated to order a competency evaluation sua sponte.

{¶ 82} Thus, proposition VII is not well taken.

{¶ 83} In proposition of law XIII, Monroe asserts that the trial court did not permit the jury to hear all relevant mitigating evidence, because it permitted defendant to waive presentation of potentially relevant testimony from numerous witnesses.

{¶ 84} However, as we discussed in response to proposition VII, a capital defendant cannot be compelled to present mitigating evidence. As we observed in *State v. Ashworth*, 85 Ohio St.3d at 63, 706 N.E.2d 1231, "a rule requiring the presentation of mitigating evidence would be impossible to enforce. Even if the court attempted to require an attorney to present mitigating evidence, it cannot force an unwilling defendant to provide that evidence to his attorney." Nor does the Eighth Amendment to the United States Constitution compel a capital defendant to present mitigation evidence against his will. See id. at 64, 706 N.E.2d 1231.

{¶ 85} We do not find error in the trial court's respecting Monroe's decision to limit the amount of mitigating evidence presented to the jury. As we stated in *State v. Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576, no societal interest counterbalances the defendant's right to control his own defense.

{¶ 86} Accordingly, proposition XIII is overruled.

## III

### Ineffective Assistance of Counsel

{¶ 87} In propositions of law I and XI, Monroe argues that he was denied effective assistance of counsel. Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. However, in no instance does Monroe demonstrate deficient performance or "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus.

{¶ 88} In proposition I, Monroe contends that counsel were deficient in failing to object to the form and substance of the testimony of David Devillers, the

former prosecutor who negotiated the plea agreement with state's witness Shannon Boyd.

{¶ 89} Monroe concedes that defense counsel objected to Devillers's testimony on two grounds before Devillers took the stand: first, that the state had not listed him as a potential witness, and second, that his testimony would be in the nature of rebuttal and therefore procedurally improper unless Devillers were called after the defense's case.

{¶ 90} The trial court overruled the defense's objections and permitted Devillers to testify as a "fact witness." The state had proposed Devillers as a late prosecution witness to refute the defense's assertion during opening statement that the police and prosecutor had "manufactured" evidence. Moreover, the state wanted to refute defense counsel's suggestion (during cross-examination of Boyd) that a secret deal had been made between the state and Boyd concerning the length of his sentence. Defense counsel specifically raised Devillers's name as the person who had worked out the plea bargain.

{¶ 91} Monroe claims that Devillers testified that he believed Boyd had given truthful information in exchange for a plea deal. Monroe asserts that his counsel should have objected to this testimony, which he claims vouched for Boyd's testimony. Monroe contends that allowing Devillers's testimony was contrary to our holding in *State v. Boston* (1989), 46 Ohio St.3d 108, 128–129, 545 N.E.2d 1220 (a child-molestation case in which we reversed the conviction because an expert witness had given her opinion as to the veracity of the child declarant).

{¶ 92} In this case, however, Devillers did not testify that he believed that Boyd had testified truthfully. Rather, he explained what had happened during the plea-bargaining process with Boyd. Devillers explained that prosecutors will not make a deal with a witness unless they conclude that the witness is telling the truth. While Devillers testified that he had agreed to the plea bargain with Boyd because he believed that Boyd was being truthful, he did not vouch for the truthfulness of Boyd's testimony. Rather, Devillers noted that the determination whether Boyd was giving truthful testimony was "completely up to the jury."

{¶ 93} Through Devillers's testimony, the prosecution sought to establish that the state and police had not manufactured evidence and that there was no "secret deal" made with Boyd. Similar to the situation we faced in *State v. Jackson* (2001), 92 Ohio St.3d 436, 449, 751 N.E.2d 946, the prosecutor here established that there was a plea agreement with the witness, and as part of that agreement, the witness had agreed to tell the truth. See, also, *State v. Williams* (1997), 79 Ohio St.3d, 1, 12–13, 679 N.E.2d 646. Even if part of Devillers's testimony was improper, any error did not affect the outcome of Monroe's trial, especially in view of the abundant evidence of Monroe's guilt. Therefore, counsel were not ineffective for failing to object to certain aspects of Devillers's testimony.

{¶ 94} Monroe asserts that although the state never offered Devillers as an expert witness, his testimony bore all the indicia of expert testimony, since it explained the new criminal-sentencing law, the parole laws, the difference between murder and manslaughter, and how prosecutors make plea bargains. Monroe contends that it was improper to allow Devillers to testify, in effect, as an expert witness, since the trial court did not formally qualify him as such.

{¶ 95} Monroe concedes that the state did not offer Devillers as an expert witness and that the trial court allowed his testimony as a "fact witness." Even if we were to view Devillers as an expert witness not formally qualified by the trial court, it is clear that Devillers's knowledge of criminal law and of the facts and circumstances of Boyd's plea bargain is not knowledge possessed by the average lay person. Thus, Devillers was qualified to testify as an expert on such matters under Evid.R. 702, even though the court did not formally qualify him as one. See *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 96} Therefore, we overrule proposition I.

{¶ 97} In proposition XI, Monroe argues that there were four instances of ineffective assistance of counsel during the penalty phase.

{¶ 98} First, Monroe contends that counsel were deficient in allowing him to waive mitigation without determining whether he was competent to do so. However, as we noted in our discussion in response to proposition VII, Monroe did not waive presentation of mitigating evidence. Monroe called a former neighbor to testify in his behalf and gave an unsworn statement to the jury. Moreover, he instructed defense counsel not to call members of his family to testify in his behalf. Although Monroe now contends that he "essentially" waived presentation of mitigating evidence, *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, does not apply to Monroe's case, since mitigating evidence was in fact presented to the jury.

{¶ 99} Nor does the record reveal sufficient indicia of incompetence to have required the trial court or defense counsel to request a competency evaluation of Monroe. Counsel became familiar with Monroe in representing him, and if they had any reason to question Monroe's competency in any respect, they surely would have done so. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 411, 692 N.E.2d 151. Neither Monroe's behavior at trial nor any testimony presented in his behalf provided "sufficient indicia of incompetence" to warrant a competency hearing. See *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433. Therefore, counsel were not deficient in failing to request a competency evaluation of Monroe.

{¶ 100} Second, Monroe asserts that counsel were ineffective for not presenting relevant mitigating testimony by Monroe's family members. Yet as we noted above, counsel presented the mitigating evidence that Monroe allowed them to

present. Monroe specifically instructed counsel not to call any of his family to testify in mitigation. An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present mitigating evidence. See, e.g., *State v. Cowans*, 87 Ohio St.3d at 81, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536–537, 684 N.E.2d 47.

{¶ 101} Third, Monroe contends that counsel were ineffective by not requesting the court to merge the aggravating circumstances. However, as we discussed in response to proposition XII, none of the aggravating circumstances/death-penalty specifications required merger. Therefore, counsel were not deficient in failing to request it.

{¶ 102} Moreover, counsel were not deficient in not objecting to the instruction that the jury was to weigh the aggravating circumstances against the mitigating factors. In *State v. Hessler* (2000), 90 Ohio St.3d 108, 126, 734 N.E.2d 1237, we stated that "[a]ggravating circumstances in a single count are considered collectively in assessing the penalty for that count * * *." Accord *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus.

{¶ 103} Last, Monroe claims that counsel were ineffective for not objecting to the trial court's repeated use of the term "recommendation" and to the second verdict form used for each murder count, which stated that a decision to impose a life sentence had to be unanimous. However, as we discussed in response to proposition X, use of the term "recommendation" correctly reflects Ohio law, and counsel were not deficient in failing to object.

{¶ 104} Similarly, counsel were not ineffective for failing to object to the verdict forms requiring a unanimous verdict for a life sentence. As we discussed in response to proposition IX, Ohio law requires a unanimous verdict for life sentences. *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph ten of the syllabus.

{¶ 105} Based on the foregoing, Monroe's claims of ineffective assistance of counsel are not well taken.

## IV

### *Constitutionality of Death Penalty*

{¶ 106} In proposition of law VI, Monroe challenges Ohio's death-penalty statutes on numerous constitutional grounds, but these claims can be summarily rejected. See, e.g., *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## V
## INDEPENDENT SENTENCE REVIEW
### *Aggravating Circumstances*

{¶ 107} Upon independent assessment, we find that the evidence proves beyond a reasonable doubt the aggravating circumstances in this case: Monroe murdered Deccarla Quincy and Travinna Simmons in connection with committing aggravated burglary, aggravated robbery, and kidnapping, and as a course of conduct involving the murder of two persons.

### *Mitigating Evidence*

{¶ 108} During the penalty phase, Monroe instructed defense counsel not to call any family members as mitigation witnesses. Thus, Monroe presented one witness, Eliza Dillard, who had known Monroe when he was a child. Dillard, a retired teacher, knew Monroe and his family in the early 1980s and knew Monroe's grandfather from high school. She stated that Monroe's family had a hard life and that Monroe's parents had a marriage fraught with infidelity, drinking, and fighting.

{¶ 109} According to Dillard, Monroe's mother was a very angry person. She frequented a nearby house where "a very permissive environment" of alcohol, sex, and possibly drugs was maintained. Monroe's father was a skilled carpenter but could not read or write. Eventually, Monroe's father left the family. Although Dillard had not seen Monroe for approximately 20 years, she said she was testifying in his behalf because of her love for him and God.

{¶ 110} Dillard described Monroe as a unique child, in that he was somewhat of a leader among his four siblings. For example, she had noticed that he usually tried to get them to obey their curfew.

{¶ 111} Monroe gave an unsworn statement noting that he did not want his family to testify in his behalf. He said, "I don't want any of them getting on the stand today and begging or pleading for my life; I won't do it either." Monroe asserted that he had not been given a fair trial but offered his condolences to the families of the two victims. He said several times that he was not begging for his life.

{¶ 112} Monroe claimed that his lawyers had decided not to offer into evidence letters Boyd had written to him, offering him money to take responsibility for committing the murders.

{¶ 113} Monroe also talked about his family life while growing up: "We had no water, electric, or food in the house, and no father provider, and often I went door to door asking for work." Monroe stated that he thought at times about blaming his parents—his mother for being depressed and his father for not being

there for him. However, he said that his mother had been abused and molested as a child by her father. He also said that his father had blamed his own father (Monroe's grandfather) for his bad actions. Monroe asked, "How could anyone be a good mother and a good father if not raised by good parents?" Yet Monroe said he ultimately placed no blame on anyone else for how his life had turned out.

{¶ 114} Monroe said that he is not proud that he had sold drugs. He told the jurors that he respected their decision but thought the evidence was not presented to them the way he thought it should have been.

### Sentence Evaluation

{¶ 115} The nature and circumstances of the offenses offer nothing in mitigation. Monroe deceived Quincy and Simmons by accepting their invitation to go to Quincy's apartment to smoke marijuana, while Monroe was planning all along to rob the women's friends. Once Monroe got into the apartment, he held the two women at gunpoint, ordered Boyd to tie them up, and then tortured them with a knife before shooting both women in the head.

{¶ 116} Monroe's history, character, and background offer little in mitigation. Monroe had a difficult childhood, and his father abandoned the family. This history provides some mitigation.

{¶ 117} With respect to the statutory mitigating factors of R.C. 2929.04(B), we note that the trial court instructed the jury on mitigating factor (B)(4), the youth of the offender, and (B)(7), any other factor mitigating against a death sentence. Monroe was 22 years old when he committed the two murders. As in previous capital cases, we accord some mitigating weight to the fact that Monroe committed his crime at that age. See, e.g., *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 105.

{¶ 118} None of the other statutory mitigating factors of R.C. 2929.04(B) appear applicable. Neither Quincy nor Simmons induced or facilitated the murders. Nor was there evidence that Monroe was under duress, coercion, or strong provocation at the time of the murders. There is no evidence that Monroe suffers from a mental disease or defect. And although Boyd assisted Monroe by tying up a victim and retrieving a knife from the kitchen, no credible evidence suggests that Monroe was not the principal offender. Nor did Monroe lack a criminal record. He was incarcerated in Chillicothe for murder at the time he was charged with these crimes.

{¶ 119} Upon independent weighing, we find that the aggravating circumstances in each murder count outweigh the mitigating factors beyond a reasonable doubt. For purposes of reviewing the sentence, we now merge counts 1, 3, 5, and 7 into one count for the murder of Quincy, and merge counts 2, 4, 6, and 8 into one count for the murder of Simmons. See *State v. Jones* (2000), 90 Ohio

St.3d 403, 419, 739 N.E.2d 300. The four aggravating circumstances in each count are particularly grave. The two victims were held at gunpoint, bound, and tortured prior to being shot in the head.

{¶ 120} As to the murder of each victim, the death penalty is both appropriate and proportionate when compared with capital cases involving aggravated murders during aggravated burglary, see, e.g., *State v. Davie*, 80 Ohio St.3d 311, 686 N.E.2d 245, and for aggravated murders during aggravated robbery, see, e.g., *State v. Burke* (1995), 73 Ohio St.3d 399, 653 N.E.2d 242, and *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482. The death penalty is also appropriate and proportionate to death sentences approved for aggravated murders during kidnapping, see, e.g., *State v. Twyford* (2002), 94 Ohio St.3d 340, 763 N.E.2d 122, and for aggravated murders as a course of conduct involving the purposeful killing or attempt to kill two or more persons, see, e.g., *State v. Keith,* 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1; and *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637.

{¶ 121} For the foregoing reasons, the judgment of the court of common pleas, including the penalty of death, is hereby affirmed.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Ron O'Brien, Franklin County Prosecuting Attorney, Steven L. Taylor, and Laura M. Rayce, Assistant Prosecuting Attorneys, for appellee.

W. Joseph Edwards and Todd W. Barstow, for appellant.