[Cite as *State v. Carter*, 2011-Ohio-522.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,                                         CASE NO. 11-10-08

   PLAINTIFF-APPELLEE,

  v.

DONALD E. CARTER,                                     **O P I N I O N**

   DEFENDANT-APPELLANT.

Appeal from Paulding County Court
Trial Court No. CRB1000062A

**Judgment Affirmed**

**Date of Decision:  February 7, 2011**

APPEARANCES:

   *Scott R. Gordon* **for Appellant**

   *Matthew A. Miller* **for Appellee**

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Donald Carter, appeals from the judgment of the County Court of Paulding County convicting him of one count of disorderly conduct with persistence in violation of R.C. 2917.11(A)(4), (E)(3)(a), sentencing him to a two year term of community control, and ordering that he pay a $200 fine and complete an anger management program. On appeal, Carter argues that the trial court erred in permitting testimony regarding firearms found on his property in violation of Evid.R. 401 and 403(A), and that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal. Based on the following, we affirm the judgment of the trial court.

{¶2} In March 2010, Carter was charged by complaint with one count of obstructing official business in violation of R.C. 2921.31, a misdemeanor of the second degree, and one count of disorderly conduct in violation of R.C. 2917.11(A)(4), a minor misdemeanor[1]. The complaint arose from an incident whereby Carter became belligerent when agents from the electric company came to his residence to turn off the power to his home but refused to remove the utility

---

[1] We note that the complaint incorrectly listed disorderly conduct in violation of R.C. 2917.11(A)(4) as a misdemeanor of the fourth degree. However, a violation of that section of the statute is a minor misdemeanor unless an additional enhancing section is charged. Nonetheless, Carter was later charged under an amended complaint of the enhancing section to properly elevate the offense to a misdemeanor of the fourth degree.

poles on his property. Subsequently, Carter entered a not guilty plea to both counts in the complaint.

{¶3} In June 2010, the State filed an amended complaint, adding to Count II that Carter "did persist in such disorderly conduct after a reasonable warning or request to desist" in violation of R.C. 2917.11(A)(4), (E)(3)(c)[2]. (June 2007 Amended Complaint, p. 1).

{¶4} Subsequently, the case proceeded to jury trial. Before the presentation of evidence, Carter raised an oral motion to exclude the evidence of the hand gun found on his person and the rifle found in his residence at the time of his arrest, arguing that they were not relevant to the charges against him under Evid.R. 401 and that their probative value was outweighed by unfair prejudice pursuant to Evid.R. 403(A). The State responded that his possession of the firearms was relevant to demonstrate the mens rea of purposely for the offense of obstructing official business. The trial court then denied Carter's motion, finding that both firearms were relevant under Evid.R. 401 to demonstrate Carter's purposeful actions in obstructing official business, and that the probative value of the evidence was not outweighed by its prejudicial impact.

---

[2] We note that the amended complaint contained the incorrect statute number, as R.C. 2917.11(E)(3)(c) reads as follows: "The offense is committed in the presence of any law enforcement officer, firefighter, rescuer, medical person, emergency medical services person, or other authorized person who is engaged in the person's duties at the scene of a fire, accident, disaster, riot, or emergency of any kind." We assume that the State meant R.C. 2917.11(E)(3)(a), as that was the language contained within the amended complaint. However, we find this clerical error to be harmless, as the jury was properly instructed on the language in R.C. 2917.11(E)(3)(a).

{¶5} Thereafter, Doug Johanns testified that he was an operation supervisor at Paulding Putnam Electric ("PPE"); that Carter sent an email to PPE asking that his electric service be disconnected because he no longer wished to receive electricity from PPE; that a crew was sent to Carter's residence to disconnect the service, but Carter asked them to leave the property; that Carter then sent another email indicating that he wanted the utility poles removed from his property; that he went with a crew a second time to Carter's residence to disconnect Carter's electric service; that, as soon as he pulled into Carter's driveway, Carter confronted him as to disconnecting the service and moving the utility poles off of the property; that he informed Carter there were costs associated with removing the poles, and that Carter would be responsible for those costs; that Carter told him he would not pay anything and that PPE would disconnect the service and remove the poles; that he discussed a plan with Carter to remove the poles, but Carter continued to insist that he would not pay for the removal, and Carter asked them to leave; that he did not believe the power could be safely disconnected from Carter's residence due to Carter's continued agitation; that Carter stated, "if you think you can go up there and disconnect that then go right ahead. * * * I am man [sic] of this property" (trial tr., vol. 1, p. 89); that they left Carter's residence, returned to their office, and decided to have a sheriff's deputy accompany them back to Carter's residence; that, when they returned to the residence, he asked Carter if he

-4-

was going to pay the delinquent amount on his bill; that Carter stated he would not pay the bill, and he told Carter they would not remove the poles from his property; that Carter told them he would not allow them to disconnect service unless they removed the poles; that he asked Carter a second time if Carter would pay his delinquent bill, and, at that point, a Sheriff's deputy stepped in and asked Carter to step aside and give them access to the property; that Carter continued to decline the deputy's request to step aside, and Carter was then placed under arrest; that, throughout this period, Carter was loud at times and upset that they would not remove the poles from his property; that Carter's presence and actions prevented them from disconnecting Carter's electric service; and, that it "wasn't a peaceful situation." (Id. at 91).

{¶6} Johanns continued that, as the deputy was handcuffing Carter, the deputy discovered a firearm on Carter; that, after Carter was arrested, they were able to disconnect Carter's electric service; that they did not have the ability to shut off the power to Carter's house from their office; that, the first time a crew was sent to Carter's property, they also did not feel they could safely disconnect the power to Carter's residence, so they left; and, that he was alarmed and inconvenienced by Carter's actions before the arrest.

{¶7} Dennis Clark testified that he was employed as a line supervisor for PPE; that, in March or April 2010, he and another employee went to Carter's

residence to disconnect the electric service, as Carter had requested; that, when they arrived at the residence, Carter asked if they were going to remove the equipment from the property, and they told him they were not; that Carter told them they could not disconnect the power unless the equipment was also removed from the property; that Johanns subsequently arrived and spoke with Carter about having the equipment removed from the property; that they left when Carter would not allow them to disconnect the electric service; that they later returned to Carter's residence after they "were called back * * * [and] the Sheriff's Department was contacted" (id. at 116); that, when they arrived at the residence, the sheriff was speaking with Carter, and Carter was acting irritated and was occasionally being loud; that he heard the sheriff tell Carter that Carter needed to let them disconnect the electric service, but Carter continued to insist that they could not disconnect the service unless the equipment was also removed; that Carter "was told two or three times to stand down and * * * was put under arrest" (id. at 117); and, that they then disconnected the electric service on Carter's property.

{¶8} Deputy Robert Garcia of the Paulding County Sheriff's Office testified that, on March 26, 2010, he was called to Carter's residence to "keep the peace at the request of [PPE]" (trial tr., vol. 2, p. 144); that he arrived at Carter's residence and Carter explained to him that he asked PPE to come to his property

and shut off his electricity and remove the utility poles from the his property; that Carter was a "little irritated" as he spoke to him (id. at 147); that Sheriff Harrow then arrived and spoke with Carter; that PPE then arrived at Carter's residence and Carter became more agitated and began talking louder and faster; that Sheriff Harrow informed Carter that PPE had the right of way to enter Carter's property to turn off the power; that Carter insisted PPE did not have the right to enter his property and that if PPE did not remove the utility poles from his property, Carter would not let them do anything; that Sheriff Harrow warned Carter multiple times that he was being disorderly and would be arrested if he did not desist his actions; that Carter then pointed at Sheriff Harrow, waived his hands, and said, "fuck you buddy, get the fuck off my property. I want everyone the fuck out of here" (id. at 150); that Sheriff Harrow then placed Carter under arrest; that, while Carter was being handcuffed, he saw a handgun sticking out of Carter's pants; that the handgun was found to be loaded; that, just before Carter was arrested, Carter was an "8" on a scale of 1-10 in loudness; that Carter's actions prior to his arrest prevented their ability to keep the peace; that Carter's actions were not accidental and Carter appeared to mean what he was saying; and, that, while he was there, he did not hear anyone from PPE inform Carter that he had not paid his bill.

{¶9} Deputy Mark Butler from the Paulding County Sheriff's Office testified that he received a call from PPE to keep the peace at Carter's residence so

-7-

that PPE could turn off the power to the residence; that he went to the residence, and Deputy Garcia was present and speaking with Carter by the garage; that he noticed an assault rifle in Carter's garage[3]; that, as he and Deputy Garcia spoke to Carter, Carter became more agitated; that Carter continued to speak louder, would "back up in a defensive position once in a while," and stated that he was not going to allow PPE on his property unless they took the utility poles off of his property; (id. at 181); that, subsequently, Sheriff Harrow and PPE arrived at the scene; that Carter became more agitated and was placed under arrest after he failed to heed multiple warnings to cease and desist; that he removed a pistol from Carter as Carter was being placed in handcuffs; that Carter prevented PPE from entering his property and turning off the electricity, despite their efforts to inform Carter that PPE had a right to enter the property; and, that he was told PPE had an easement across Carter's property to the utility pole, but he never saw a document verifying that.

{¶10} Sheriff David Harrow of the Paulding County Sheriff's Department testified that he was called to Carter's residence to keep the peace while PPE shut off the power to Carter's residence; that, as he spoke with Carter, Carter became more agitated, raising his voice, coming towards the deputies, shifting his weight from foot to foot, and ordering people off the property; that he informed Carter on

---

[3] We note that Carter's trial counsel objected to the testimony regarding the handgun and the assault rifle.

at least two occasions that Carter was engaging in disorderly conduct and needed to cease and desist; that Carter's actions interfered with PPE's ability to disconnect the power; that they then placed Carter under arrest; that, while Carter was being arrested, they removed a handgun from the back of Carter's pants, underneath his belt; that he was not aware that one of the purposes of PPE's presence on Carter's property was to collect money owed to them by Carter; that he was not aware of whether PPE filed a civil action against Carter for monies owed to them; and, that Carter placed himself between PPE employees and the utility pole on the property during the time Carter was agitated.

{¶11} Thereafter, the State rested and moved for the admission of exhibits, including the handgun seized from Carter, and Carter again objected to the admission of the handgun, which the trial court overruled.

{¶12} Subsequently, Carter moved for a judgment of acquittal pursuant to Crim.R. 29(A), arguing that insufficient evidence was presented to establish that he committed the offense of disorderly conduct with persistence, as it was not shown that PPE had any lawful purpose or right to be on his property. The trial court then denied the motion.

{¶13} Following Carter's testimony, the jury acquitted Carter on obstructing official business under R.C. 2921.31, but convicted him of disorderly conduct with persistence under R.C. 2917.11(A)(4), (E)(3)(a).

{¶14} In July 2010, the trial court sentenced Carter to a two-year term of community control and ordered that he pay a $200 fine and complete an anger management program.

{¶15} It is from his conviction and sentence that Carter appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY ALLOWING TESTIMONY AND EVIDENCE TO BE PRESENTED TO THE JURY REGARDING THE HANDGUN.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED BY OVERRULING HIS CRIM.R. 29 MOTION FOR ACQUITTAL.**

*Assignment of Error No. I*

{¶16} In his first assignment of error, Carter argues that the trial court erred by permitting testimony regarding the handgun found on his person and by allowing the introduction of the handgun into evidence. Specifically, Carter contends that the handgun was not relevant to either the charge of obstructing official business or the charge of disorderly conduct pursuant to Evid.R. 401, and, even if relevant, was substantially more prejudicial than probative pursuant to Evid.R. 403(A).

{¶17} We initially note that Carter objected to the presentation of testimony regarding the handgun and the admission of the handgun into evidence, both

before trial and during the trial, thereby preserving this issue for appeal. See *State v. Eaton*, 3d Dist. Nos. 2-10-10, 2-10-11, 2010-Ohio-6065, ¶12, citing *State v. Grubb* (1986), 28 Ohio St.3d 199, 203

**{¶18}** An appellate court reviews the trial court's decision on the admission of evidence for an abuse of discretion. *State v. Heft,* 3d Dist. No. 8-09-08, 2009-Ohio-5908, ¶62, citing *State v. Issa,* 93 Ohio St.3d 49, 64, 2001-Ohio-1290. Accordingly, an appellate court will not disturb a trial court's evidentiary decision unless the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Barnes,* 94 Ohio St.3d 21, 23, 2002-Ohio-68. When applying an abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle* (2000), 11th Dist. No. 99-L-089, 2000 WL 777835.

**{¶19}** Evid.R. 402 provides that relevant evidence is generally admissible except as otherwise provided by the rules of evidence and other laws or statutes. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Furthermore, Evid.R. 403(A) provides that relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶20} In the case at bar, Carter was charged with obstructing official business under R.C. 2921.31, which provides as follows:

> **No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.**

Additionally, Carter was charged with disorderly conduct under R.C. 2917.11(A)(4), (E)(3)(a), which provides as follows:

> **(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:**
>
> **\* \* \***
>
> **(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;**
>
> **\* \* \***
>
> **(E)(3) Disorderly conduct is a misdemeanor of the fourth degree if any of the following applies:**
>
> **(a) The offender persists in disorderly conduct after reasonable warning or request to desist.**

{¶21} In ruling upon Carter's motion to exclude the evidence of the handgun, the trial court found that the presence of the handgun was relevant under Evid.R. 401 to demonstrate the mens rea of purposeful with respect to the

obstructing official business charge and that it was not substantially more prejudicial than probative under Evid.R. 403(A).

{¶22} While we may disagree with the trial court's ruling on the matter, as it appears the possession of the handgun may not have been relevant to the charges based upon the facts of the case, we note that, even if the trial court abused its discretion in admitting the evidence, there was no prejudice to Carter. The State argued for the admission of the handgun, and the trial court admitted it on the basis that the handgun was relevant to show Carter's mental state in committing the offense of obstructing official business. However, Carter was acquitted on that charge by the jury. Moreover, because the jury acquitted Carter on that charge, it appears unlikely the evidence of the handgun would have prejudicially affected the jury's decision on the remaining charge of disorderly conduct. Therefore, any error in admission of the evidence of the handgun was harmless in this case.

{¶23} Accordingly, we overrule Carter's first assignment of error.

*Assignment of Error No. II*

{¶24} In his second assignment of error, Carter argues that the trial court erred in denying his Crim.R. 29(A) motion for judgment of acquittal. Specifically, he contends that the State presented no evidence demonstrating that PPE had an

easement or right to enter and remain on his property[4].

{¶25} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶47, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶26} Carter was convicted of disorderly conduct under R.C. 2917.11(A)(4), (E)(3)(a), as set forth in the first assignment of error. At trial, Doug Johanns testified that Carter told him to leave Carter's property when he indicated to Carter that he would not remove the utility poles; that Carter also told him Carter would not pay his delinquent bill; that he felt he could not safely

---

[4] We also note that Carter asserts in his second assignment of error that insufficient evidence was presented to support a conviction under R.C. 2917.11(A)(4), (E)(3)(c), as no testimony was presented establishing that the officer's presence on his property was due to a fire, accident, disaster, riot, or emergency. However, Carter's conviction was under R.C. 2917.11(A)(4), (E)(3)(a), as we previously noted that the amended complaint's inclusion of section (E)(3)(c) was a harmless clerical error, and that the intended statutory language under (E)(3)(a) was used and the jury properly instructed on subsection (E)(3)(a).

disconnect the power due to Carter's actions; and, that Carter refused to heed the deputies' multiple warnings to stand aside so he could disconnect the power.

{¶27} Additionally, Deputy Garcia testified that Carter informed him he would not allow PPE on his property unless they removed the utility poles from his property; that he informed Carter that PPE had a right to enter his property to disconnect the power; and, that Carter was arrested after he failed to heed multiple warnings to cease and desist in his disruptive actions.

{¶28} Consequently, we find that sufficient evidence was presented to establish that Carter engaged in disorderly conduct in violation of R.C. 2917.11(A)(4), (E)(3)(a). Although Carter contends that the State failed to present evidence that PPE had the right to enter his property, Deputy Garcia testified that he informed Carter that PPE had the right to enter the property to disconnect the power. Additionally, Carter testified that the utility poles were PPE's property, which we find to be an acknowledgment of PPE's right-of-way over Carter's property, and that he was delinquent on his utility bill, thereby giving PPE the right to enter his property onto the right-of-way to disconnect the power.

{¶29} Accordingly, we overrule Carter's second assignment of error.

{¶30} Having found no error prejudicial to the appellant herein, in the

particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jnc**