[Cite as *State v. Fomby*, 2013-Ohio-2821.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-L-073** |
| CARVELL J. FOMBY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000263.

Judgment: Affirmed in part; reversed in part and remanded.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Ruth R. Fischbein-Cohen*, 3552 Severn Road, Suite 613, Cleveland Heights, OH 44118 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the final judgment in a criminal proceeding before the Lake County Court of Common Pleas. Appellant, Carvell J. Fomby, seeks reversal of his conviction on multiple counts of aggravated burglary and aggravated robbery, and one count of felonious assault. In part, appellant contends that his conviction on all counts was either not supported by sufficient evidence, or was against the manifest weight of the evidence.

{¶2}    This case concerns a home invasion during the late evening of April 5, 2011.  The home is on Richmond Street in Painesville, Ohio, and was being rented by Russell Perry and Shaquetta Page.  Shaquetta's three minor children also resided in the home.  In addition, one of Russell's minor daughters would occasionally spend the night there.

{¶3}    Even though the couple's home had two entranceways, the back door was primarily used to enter the residence.  The back door leads into the kitchen.  Upon exiting the kitchen and moving forward, there are the dining room and then the living room.  At one side of the living room is a staircase leading to the second floor, where three bedrooms are located.

{¶4}    On the evening at issue, Russell and Shaquetta had a late dinner with her three children and one of Russell's daughters.  When the meal ended shortly before 11:00 p.m., Shaquetta and the four children went upstairs to prepare for bed.  Russell stayed downstairs to clean the kitchen.  At some point, Russell took the trash outside to a container located near the back door.

{¶5}    As Russell was re-entering the home and beginning to shut the back door, two men pushed on the door and forced their way into the kitchen.  Initially, the first man pushed Russell backward with his hands.  Russell tried to resist.  However, the second man produced a small silver firearm and placed the barrel directly on Russell's forehead.  The second man then stated directly to Russell: "[Y]ou know what it is, we want everything, * * *."

{¶6}    Although Russell no longer tried to resist, the two men continued to push him across the room until he fell on the floor by the refrigerator.  During the course of

their confrontation, the two men hit Russell on his head a number of times, and he sustained a number of scrapes and bruises on his face and skull.

{¶7} When Russell was finally subdued, he was lying on his stomach with his face pressed on the floor. The first man sat on top of Russell and held his head down. Initially, Russell thought that the first man was pressing the barrel of a firearm to the back of his head; so he made no attempt to get up for a while. While lying there, Russell saw the second man leave the kitchen and walk through the dining room and living room.

{¶8} After going through the living room, the second intruder went up the stairs and started down the hallway toward Shaquetta's bedroom. As the man came toward her, Shaquetta was talking on her cell phone to her sister. At first, Shaquetta believed that the person entering her room was her brother; hence, she told her sister goodbye and "hung up" the phone. She then turned toward the second man and quickly realized her mistake. However, before she could do anything, the second man again pulled out the small firearm, placed it against Shaquetta's head, and said that he was going to rob her.

{¶9} Immediately after making the statement to Shaquetta, the second intruder heard a police siren going off in the distance. As a result, he grabbed the phone from Shaquetta's hands, ran over to the bedroom dresser, and momentarily looked for something else to take. When he did not see anything, he ran into the hallway and down the stairs. After quickly checking upon the welfare of the children, Shaquetta followed the second man to the first floor.

{¶10} While the second man was upstairs, Russell realized that the first man did

3

not have a gun, but was instead forcing Russell's head down with his knuckles. Russell therefore began to resist again, and was able to throw the first intruder off. Upon getting to his feet, Russell was ultimately able to shove the first man out the back door. The first man then ran through the back yard and leaped over a fence into a neighbor's yard. Although Russell followed the first man outside and saw him go over the fence, he did not try to chase him any further. Rather, he ran down his driveway, intending to go across the street and use a phone in a local store to call the police.

{¶11} After going downstairs, the second intruder ran to the kitchen and went out the back door. Russell did not see the second man leave the home. However, Shaquetta followed the second man out the back door and saw him leap over the fence on the side of their yard. She then walked toward the street at the front of the home and met Russell in the middle of the roadway. Since Russell's daughter had used her cell phone to call the police while the incident was ongoing, the police arrived at the scene within a few minutes of the second intruder leaving.

{¶12} Neither of the intruders were apprehended the evening of the incident. In speaking to the police upon their arrival at the scene, Russell stated that he previously had seen the first intruder, i.e., the man who had held him down on the kitchen floor, at various places in the neighborhood, but could only remember his first name. Similarly, Shaquetta told the police that she had recognized the intruder with the firearm from the neighborhood. Although she also tried to provide a first name for the second man, the name was not sufficient to enable the police to determine his identity. In addition, both Russell and Shaquetta stated that they had noticed during the incident that the second intruder had a "teardrop" tattoo by his eyes.

4

{¶13} Over the next three days, Russell and Shaquetta spoke to a number of family members or friends in an attempt to identify the correct name of the intruder who wielded the firearm. Eventually, the couple learned that the first name of the individual they were describing was "Carvell." After they relayed this new information to the police, appellant was immediately identified as a possible suspect. In light of this, the police had Shaquetta come to the police department so that she could review a photo array of possible suspects. When she first went through the array of six photos, Shaquetta did not identify appellant as the intruder with the firearm. She reviewed the photos a second time, however, and identified appellant as the man who held the firearm to her head.

{¶14} In September 2011, the county grand jury returned a six-count indictment against appellant. The charges included two counts of aggravated burglary, a felony of the first degree under R.C. 2911.11(A), three counts of aggravated robbery, a felony of the first degree under R.C. 2911.01(A), and one count of felonious assault, a felony of the second degree under R.C. 2903.11(A). Each of the counts also contained a firearm specification, under which it was alleged that appellant displayed or used a firearm while committing the underlying offense.

{¶15} Ultimately, a three-day jury trial was held in May 2012. Appellant was tried together with his co-defendant, Ricci Lewis, who was identified as the "first man" who entered the home during the incident. Russell and Shaquetta were the primary witnesses for the state. They both testified that they were certain that appellant was the individual who held the firearm to their heads. Appellant was found guilty of all six counts.

5

{¶16} After a presenting report was prepared, the trial court held a sentencing hearing. At the outset, the trial court concluded that the two counts of aggravated burglary would be merged for purposes of sentencing. As to the remaining three counts relating solely to Russell, the court further held that two of the aggravated robbery counts and the sole felonious assault count would be merged. As a result, appellant was only sentenced on a single count of aggravated burglary, two counts of aggravated robbery, and two firearm specifications. In addition to imposing two three-year terms on the firearm specifications, the trial court ordered appellant to serve two concurrent terms of six years on the aggravated robbery counts, and a five-year term on the remaining aggravated burglary count, to be served consecutively to the "aggravated robbery" terms, for an aggregate prison term of 17 years.

{¶17} In appealing both his conviction and sentence, appellant has raised four assignments of error for review:

{¶18} "[1.] The trial court erred in convicting Carvell Fomby as there was legally insufficient evidence to support a conviction.

{¶19} "[2.] The trial court committed prejudicial error when it failed to merge the multiple counts of aggravated robbery and aggravated burglary, as allied offenses of similar import, in violation of O.R.C. 2941.25(A).

{¶20} "[3.] The trial court committed prejudicial error when it refused to waive court costs, although Mr. Fomby was indigent; and when advising Carvell Fomby of his financial obligations during sentencing, it failed to inform the statutory R.C. 2947.23 requirements.

{¶21} "[4.] The conviction was against the manifest weight of the evidence,

6

lacking credibility."

{¶22} Under his first assignment, appellant contests the sufficiency of the state's evidence regarding the presence of a firearm during the course of the home invasion. As his primary argument on this point, he asserts that there was no evidence to support a finding that he had actual possession of the firearm while he was inside the residence. According to appellant, Russell Perry's trial testimony could only be interpreted to show that he was the man who sat upon Russell's back and forced his face into the kitchen floor. Appellant further emphasizes that, under Russell's version of the events, the man on his back did not have a gun and was only using his hands to keep Russell subdued.

{¶23} As part of his direct testimony, Russell stated that he eventually realized that the intruder who was sitting upon his back did not have a firearm, but instead was employing his hands and knuckles to force Russell's face into the floor. Russell further testified that he was able get this particular intruder off his back, and then force the man out the back door before he could go into any other room in the home.

{¶24} However, in giving the foregoing testimony about the person on his back, Russell was not referring to appellant. Rather, Russell was clearly referring to the co-defendant, Ricci Lewis. There is no dispute that Russell identified appellant as the man who placed the barrel of a small silver firearm on forehead. Furthermore, Russell clearly testified that appellant was the intruder who left the kitchen after he had been subdued and was lying on the floor.

{¶25} In addition, as part of her trial testimony, Shaquetta specifically identified appellant as the man who came into her bedroom and placed the barrel of a firearm on her head to ensure her cooperation in the robbery. Hence, the state clearly presented

7

evidence from which the jury could find that it was appellant who had a small firearm in his possession.

{¶26} As a separate argument under this assignment, appellant states that there was a dispute under Russell's trial testimony regarding whether either of the intruders had a firearm when they entered the home. However, in raising this point, he only cites to that aspect of Russell's testimony in which he indicates that Ricci Lewis, the man who kept him subdued on the kitchen floor, did not have a firearm. Considered as a whole, Russell's testimony was not confusing as to the fact that appellant had the firearm and Lewis did not.

{¶27} "'Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while 'manifest weight' contests the believability of the evidence presented.

{¶28} "'"(* * *) The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefore in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. * * *"'* (Emphasis added.)" *State v. Schlee*, 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *13-14 (Dec. 23, 1994).

{¶29} Any rational trier of fact could have found from the testimony that appellant had a firearm in his possession when he entered the home with Ricci Lewis. Therefore, appellant's first assignment is not well taken.

{¶30} Since appellant's fourth assignment also asserts a challenge to the legal

8

propriety of the state's evidence, it will be addressed next. Specifically, he submits that his conviction for aggravated robbery concerning Shaquetta was against the manifest weight of the evidence because her testimony was simply unbelievable. According to appellant, Shaquetta's statements as to his presence in her upstairs bedroom should have been rejected by the jury because it directly conflicted with Russell's testimony that appellant was the intruder who sat upon him on the kitchen floor and was chased out the back door without ever going upstairs.

{¶31} As was discussed under the first assignment, appellant's characterization of Russell's testimony is not supported. That is, Russell did not testify that appellant was the man who sat upon him after he was initially subdued in the kitchen. Instead, Russell clearly stated that it was Ricci Lewis who stayed in the kitchen throughout the entire incident, and that it was appellant who left the kitchen and went toward the front of the home where the staircase was located. To this extent, there was no conflict between Russell's and Shaquetta's testimony.

{¶32} The respective testimony of Russell and Shaquetta had some inconsistencies. However, none of these inconsistencies were so critical to the testimony as to render Russell or Shaquetta unbelievable witnesses. As to the critical point, though, both identified appellant as possessing a firearm. Therefore, the record does not support the conclusion that the jury abused its discretion in believing the respective testimony of the two primary state witnesses.

{¶33} As a general proposition, a finding of guilt in a criminal action can only be reversed as against the manifest weight of the evidence when the record shows that the jury lost its way in determining the credibility of witnesses and resolving any conflicts in

the evidence. *Schlee*, 1994 Ohio App. LEXIS 5862, at *14-15. Any inconsistencies in the testimony of Russell and Shaquetta were not sufficient to justify the conclusion that the jury lost its way in believing the primary assertions in their testimony. For this reason, appellant's fourth assignment lacks merit.

{¶34} Under his second assignment, appellant contends that the trial court erred in not merging the single count of aggravated burglary into the two remaining counts of aggravated robbery. Without addressing the question of whether the foregoing crimes are allied offenses of similar import, appellant maintains that separate sentences could not be imposed for all three remaining offenses because the evidence established that the aggravated burglary and the two aggravated robberies were committed as part of one continuous criminal act.

{¶35} The legal effect of a defendant's conviction on multiple crimes is governed by R.C. 2941.25:

{¶36} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶37} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶38} In its most recent pronouncement on the "allied offenses" issue, a plurality of the Supreme Court of Ohio summarized its general application of R.C. 2951.25:

10

**{¶39}** "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct. \* \* \*. If the offenses correspond to such a degree that the conduct of the defendant constituting the commission of one offense constitutes commission of the other, then the offenses are of similar import.

**{¶40}** "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' \* \* \*.

**{¶41}** "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

**{¶42}** "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." (Citations omitted and emphasis sic.) *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶48-51.

**{¶43}** Although the foregoing analysis was only followed by a plurality of the Supreme Court, this court expressly adopted the *Johnson* analysis in *State v. Muncy*, 11th Dist. No. 2011-A-0066, 2012-Ohio-2830.

**{¶44}** In our case, the trial court determined that the aggravated burglary charge under count one of the indictment, which was merged with the other aggravated burglary count, could not be merged with the remaining aggravated robbery count as to Russell because appellant had a separate animus as to each offense. Before this court, appellant does not contest the fact that the trial court was not obligated to merge the

11

two remaining counts of aggravated robbery because those two crimes involved two different victims.  Hence, our analysis will focus upon the merits of the trial court's ruling as to whether the two remaining counts relating solely to Russell, aggravated robbery and aggravated burglary, should have been merged.

{¶45}  Under the first count, appellant was charged with aggravated burglary under R.C. 2911.11(A)(1), which provides:

{¶46}  "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

{¶47}  "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *."

{¶48}  Under the second count of the indictment, appellant was charged with aggravated robbery pursuant to R.C. 2911.01(A)(1), which states:

{¶49}  "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶50}  "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; * * *."

{¶51}  It is possible to commit aggravated burglary and aggravated robbery with the same conduct.  However, a trial court can still impose separate prison terms for the two offenses if, pursuant to R.C. 2941.25(B), the crimes were not committed by the

same conduct. The two offenses are allied and must be merged for sentencing only when "the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Johnson*, 2010-Ohio-6314, at ¶49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶50.

**{¶52}** In our case, the remaining aggravated robbery count relating to Russell was based upon the allegation that appellant had a deadly weapon in his possession and displayed or brandished it. Appellant first displayed the firearm when he placed it on Russell's head. It was also at that point that appellant told Russell that he and Lewis wanted "everything" Russell had, stating his intent to commit a theft offense against him. That conduct alone satisfied all elements of aggravated robbery under R.C. 2911.01(A)(1).

**{¶53}** Under R.C. 2911.11(A)(1), the aggravated burglary as to Russell was completed when appellant subsequently inflicted physical harm to Russell in the ensuing scuffle ending by the refrigerator. Given that the physical harm element for aggravated burglary was committed by additional conduct which was not needed to prove the aggravated robbery, the counts do not merge.

**{¶54}** In other words, separate sentences are permitted for the two offenses against Russell because the commission of the two crimes were not based upon the exact same conduct; i.e., an additional act was performed which, although unnecessary for the commission of aggravated robbery, completed the offense of aggravated burglary. If a separate penalty could not be imposed for the aggravated burglary, it would essentially mean that appellant and Lewis would be free to inflict physical harm upon Russell without having to face additional penalty. Such a result was clearly not

13

intended by the General Assembly in enacting R.C. 2941.25(B). *See State v. Frazier*, 58 Ohio St.2d 253 (1979); *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶66; *State v. ONeil*, 11th Dist. No. 2010-P-0041, 2011-Ohio-2202, ¶46-51.

**{¶55}** In light of the foregoing, the trial court correctly imposed separate sentences regarding the aggravated burglary count and the aggravated robbery count relating to Russell Perry. Similarly, no error occurred when the trial court imposed a three-year term on two of the three remaining firearm specifications, consistent with R.C. 2929.14(A)(1)(g). Therefore, appellant's second assignment is also without merit.

**{¶56}** Under his third assignment, appellant maintains the trial court erred in denying his motion to waive payment of court costs. He argues that he was entitled to such relief because he will be incarcerated for a lengthy period of time under the imposed sentence.

**{¶57}** At the end of the sentencing hearing, defense counsel orally moved the trial court to suspend all court costs. In support of the request, defense counsel asserted that appellant would not be able to pay because he had been ordered to serve a seventeen-year term. In denying the motion, the trial court noted that appellant is a young man, and that it would be premature and speculative to try to determine if he will have the ability to pay in the future.

**{¶58}** Pursuant to R.C. 2947.23(A)(1), a trial judge is required to include in the sentence of a criminal defendant a judgment against him for court costs. The language of this statute has been construed to be mandatory. *See State v. John*, 6th Dist. No. L-03-1261, 2005-Ohio-1218, ¶33. Thus, a trial court has the authority to order payment of court costs even if the defendant is indigent. *State v. Anderson*, 11th Dist. No. 2011-G-

14

3044, 2012-Ohio-4203, ¶42. However, after the imposition of court costs, a trial court has the discretion to waive the actual payment of those costs. *John*, 2005-Ohio-1218, at ¶34. Upon appellate review, the denial of a motion to waive such costs will be upheld unless the record demonstrates an abuse of discretion. *Anderson*, 2012-Ohio-4203, at ¶42.

{¶59} "When a criminal defendant requests the court to waive his payment of the mandatory costs of R.C. 2947.23, the court must find that a criminal defendant, formerly found indigent for purposes of appointing counsel, has or will have the ability to pay costs in order to deny a waiver. Although a determination of ability to pay is within the discretion of the trial court, such determination cannot be made without regard to the defendant's financial condition. An appellant's future ability to pay should be on the record and based on circumstances in existence at the time of the finding. The court is not required to hold a hearing to determine indigency, but a court should examine the record and weigh, given the defendant's circumstances, the probability that he will be able to pay in the future. Consideration of a defendant's conditions should include health, education, work history, and the length of the prison sentence imposed. A prior determination of indigency is a strong presumption supporting a *lack of* an ability to pay the mandatory costs, but it is not conclusive. However, if the record reflects a lack of support for a determination of future ability to pay such that it is unreasonable, arbitrary, or unconscionable, then the failure to waive those costs for the indigent defendant is an abuse of discretion." (Emphasis sic.) *John*, 2005-Ohio-1218, at ¶35.

{¶60} The Supreme Court of Ohio has held that the issue of the waiver of payment of court costs will itself be considered waived unless the criminal defendant

makes the proper motion at the time of sentencing. *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, ¶23. As a result, a trial court has a duty to engage in the foregoing analysis as part of the sentencing process. In this case, the trial court concluded that it would be speculative to engage in any analysis concerning appellant's future ability to pay at the time of sentencing. However, the trial court was required to make that determination immediately. *Id.* Therefore, because the trial court did not engage in the requisite analysis for determining a motion to waive costs, this case is remanded so that the trial court can consider the proper factors and render a judgment on the motion.

{¶61} As a separate point, in denying the motion for waiver of court costs, the trial court failed to comply with the requirements of R.C 2947.23(A)(1)(a). This statute has since been amended, but at the time of sentencing provided that, in ordering the payment of court costs, the trial court must *orally* notify the defendant of the following:

{¶62} "(a) If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in full compliance with the approved payment schedule [and]

{¶63} "(b) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount."

{¶64} The duty to orally notify the defendant of the potential for future imposition of community service is mandatory. *See State v. Moore*, 11th Dist. No. 2011-G-3027,

16

2012-Ohio-3885, ¶82-84, citing *State v. Smith*, 131 Ohio St.3d 297, 2012-Ohio-781, syllabus. During the sentencing hearing, the trial court did not give the required oral notification. However, there was no objection to the lack of oral notification. Under such circumstances, a "plain error" analysis must be applied. *See* Crim.R. 52(B); *State v. Jackson,* 10th Dist. Nos. 12-AP-768 & 12AP-769, 2013-Ohio-1152, ¶17.

**{¶65}** "Plain error exists only where, but for the error, the outcome of the trial would have been different. *State v. Bennett,* 11th Dist. No. 2002-A-0020, 2005-Ohio-1567, ¶55. Therefore, to warrant reversal for plain error, this court must find that: (1) there was an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., there was an 'obvious' defect in the trial proceeding; and (3) the error affected substantial rights, i.e., affected the outcome of the trial. *Id.* at ¶56." *State v. Sawyer,* 11th Dist. No. 2011-P-0003, 2012-Ohio-5119, ¶6

**{¶66}** In its final written judgment, the trial court expressly stated that appellant could be subject to community service under R.C. 2947.23(A) if he did not timely satisfy the "court costs" order; thus, appellant was provided with written, as opposed to oral, notice. Second, R.C. 2947.23(A) does not mandate the imposition of community service for lack of payment, but merely grants the trial court the ability to futuristically order community service in the event that the costs are not paid. The requirement is essentially an "if-maybe" notice. As a result, the oral notification only informs the defendant of a possible condition that may be later imposed. To this extent, the lack of proper oral notification does not have immediate effect. Third, given that the state can collect court costs through the garnishment of an inmate's prison account, *Jackson,* 2013-Ohio-1152, ¶17, appellant's court costs, even if they are not waived by the trial

17

court upon remand, are likely to be paid before he is released and the "community service" provision is triggered.

{¶67} For these reasons, the trial court's failure to comply with the oral notification requirement of R.C. 2947.23(A)(1) had no adverse effect upon appellant's trial, as no miscarriage of justice occurred that would warrant a finding of plain error. Therefore, upon remand, the trial court need only give proper consideration to appellant's motion to waive court costs.

{¶68} To the extent stated in our discussion, appellant's third assignment of error has merit.

{¶69} Consistent with our analysis of the third assignment, it is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is reversed in part, and the case is hereby remanded for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.


CYNTHIA WESTCOTT RICE, J., concurs,

TIMOTHY P. CANNON, P.J., concurring in part and concurring in judgment only in part with Concurring Opinion.

_____


TIMOTHY P. CANNON, P.J., concurring in part and concurring in judgment only in part.

{¶70} I concur in judgment only as applied to appellant's third assignment of error involving former R.C. 2947.23(A)(1)(a). Though the majority adopts a plain-error analysis, the recent precedent set forth in *State v. Field*, 11th Dist. No. 2012-G-3082,

2013-Ohio-2257, ¶33; *State v. Fetty*, 11th Dist. No. 2011-P-0091, 2012-Ohio-6127, ¶71-72; and *State v. Taylor*, 11th Dist. No. 2011-P-0090, 2012-Ohio-3890, ¶43, focuses on the Ohio Supreme Court's emphasis on the obligatory language of the former statute. *State v. Smith*, 131 Ohio St.3d 297, 2012-Ohio-781.

{¶71} I concur with the more straightforward approach of the Second Appellate District in resolving this issue: simply acknowledge the error, modify the judgment to eliminate any possibility that the appellant could be required to perform community service as an option in lieu of paying costs, and then affirm the judgment as modified. *See State v. Veal*, 2d Dist. No. 25253, 2013-Ohio-1577, ¶20; and *State v. Haney*, 2d Dist. No. 25344, 2013-Ohio-1924, ¶21. Only a few cases will require this approach given the statute's recent amendment.

{¶72} I concur with the majority's judgment and reasoning as applied to all remaining assignments of error.