[Cite as *State v. Carter*, 2013-Ohio-3787.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 13-13-03

  v.

SETH A. CARTER,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 12-CR-0097

**Judgment Affirmed**

**Date of Decision:  September 3, 2013**

APPEARANCES:

    *Randy F. Hoffman* **for Appellant**

    *Heather N. Jans* **for Appellee**

**ROGERS, J.**

{¶1} Defendant-Appellant, Seth A. Carter, appeals the judgment of the Court of Common Pleas of Seneca County, finding him guilty of one count of theft and sentencing him to 170 days in jail. On appeal, Carter contends that the trial court erred by: (1) denying his motion for acquittal at the end of the State's evidence; and (2) entering a guilty verdict that was against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On July 11, 2012, the Seneca County Grand Jury returned a one count indictment against Carter charging him with one count of theft of a credit card in violation of R.C. 2913.02(A)(1), (B)(2), a felony of the fifth degree.

{¶3} A jury trial was held in this matter on January 17 and 18, 2013. The following relevant evidence was adduced during the State's case-in-chief.

{¶4} On April 26, 2012, Tiffin police responded to a report of a residential burglary at 32 Hall Street, the home of Robert ("Robert") and Michelle ("Michelle") Smith (collectively "the Smiths"). At approximately 5:00 a.m. that day, Robert was finishing his morning routine of prayers and physical therapy when he noticed Michelle's keys on the floor. Upon further inspection, Robert observed that his office window was open and discovered muddy footprints going across the office floor. Robert then woke Michelle up and together they looked for her purse. The Smiths were unable to find Michelle's purse and immediately called the Tiffin Police Department. The police arrived shortly after and began to

process the crime scene. The police asked the Smiths for some documentation, which they usually kept inside a small safe in their office. When Robert went to retrieve the information, he discovered that the safe was also missing.

{¶5} Michelle's purse contained $800.00 in cash, various credit cards, rosaries, medication, and other miscellaneous items. Inside the safe were several personal documents, such as birth certificates, the Smiths' marriage license, pictures of their deceased daughter, the deed to their burial plot, backups to their computers, and approximately $1,000.00 in cash.

{¶6} On the morning of April 30, 2012, the Smiths received a phone call from a private number. Carter later admitted that he had called the Smiths that day. What was said during this phone call was disputed at trial. Robert testified that Carter said he had found some items that he believed belonged to the Smiths. Carter then asked Robert if there was a reward. Robert claimed that he told Carter that there was not a reward available, but he would appreciate it if Carter turned their property into the police department, as it was part of a burglary investigation.

{¶7} According to Robert, Carter then told Robert that he needed some money to pay some bills. Robert replied that he could probably give Carter $50.00 if he returned the property, but Carter was unsatisfied and told Robert he needed $70.00. Robert said he would try to obtain the $70.00 and give it to Carter. Robert first tried to convince Carter to drop the property off at the police department, but Carter refused. Robert then asked if Carter could drop it off at a

nearby church, which Carter also refused. Eventually, Robert and Carter agreed the two would meet at Noble School. Carter repeatedly asked Robert not to get the police involved, and Robert promised he would not. Robert then went to Noble School to meet Carter. However, Carter never showed up. After waiting for an hour, Robert returned home and told Michelle that he was going to look for their property on Davis Street, which is where Carter claimed to have found the Smiths' stolen property. Robert told Michelle not to answer the phone if it came up as a private number.

{¶8} Robert did not find anything at the end of Davis Street except "a lot of mud." Trial Tr., p. 136. He then testified that it had rained and snowed between the date the Smiths' property went missing and the date Carter made his phone call. While searching for their stolen property, Michelle called Robert and told him that a private number had called their house three times. By the time Robert got home, Carter had called the Smiths five times. The Smiths called the police department again and they arrived as Carter called the Smiths for the sixth time. The officer at the Smiths was able to record part of the phone conversation.

{¶9} At trial, the State offered this phone recording into evidence as State's Exhibit 1 and played it for the jury. On the recording, Carter can be heard telling Robert not to call the police and arranging to drop off the property at the Smiths' residence. After the phone called ended, the police officer left the Smiths' residence and Michelle went to her bedroom and locked the door. Shortly

thereafter, Carter arrived at the Smiths. Robert helped Carter get the Smiths' property from the trunk of Carter's car and then Robert gave Carter $70.00. Robert testified that as Carter was leaving, he told Robert to invest in a security system.

{¶10} After Carter left, the Smiths took their recovered property to the police department and gave a description of Carter and his car. The police were able to locate Carter at his residence at 107 Olive Street. Robert was shown a photo lineup and he was able to pick Carter from the lineup.

{¶11} On cross-examination, Robert testified that inside Michelle's purse was a letter to the editor of a Tiffin newspaper stating that if someone had found his wife's missing rosary the Smiths would offer a reward for the rosary. Robert explained that this letter was from a previous incident, where Michelle's rosary was taken from her car. Although this separate incident happened several months ago, Michelle still had the letter in her purse. Robert also admitted to lying to Carter about not calling the police.

{¶12} Michelle then testified and corroborated much of Robert's testimony. She also elaborated on the letter that was found in her purse concerning a previous, stolen rosary. Unlike her husband, she denied that the letter offered a reward for the missing rosary. Instead, she explained that the letter asked whoever borrowed her rosary to return it to her and she would give them another rosary, but not a reward.

{¶13} Detective Rob Bour also testified for the State about his involvement in the investigation. He testified that he and Detective David Horn interviewed Carter. During the interview, Carter told the detectives that he had found the purse and safe down by the river while he was fishing. Further, Detective Bour testified when asked about the reward money, Carter originally told him he was only paid $50.00, but eventually admitted to receiving $70.00.

{¶14} Detective Horn corroborated Detective Bour's testimony. Detective Horn also testified that during the interview, Carter changed his story on where he found the stolen property many times. First, Carter stated he found the property while walking his dog down the street. Then Carter told Detective Horn that he had found it while fishing with a friend. Finally, Carter told Detective Horn that he had found the property at the house of John Smith, one of his acquaintances.

{¶15} At the close of the State's evidence, Carter moved for a Crim.R. 29 motion for acquittal, which the trial court denied. During Carter's case-in-chief, the following relevant evidence was adduced.

{¶16} Carter testified, explaining that he had found the Smiths' property when he was walking his dog on Water Street. Carter stated that when he started to look through the purse he found a letter that talked about a reward. Carter claimed that this letter had all of the Smiths' contact information and said that if any of their possessions were found to return them for a reward. Subsequently, Carter called Robert and told him that he had found his safe and purse. Carter

asserted that he never demanded a reward for the Smiths' property and "could care less about it." Trial Tr., p. 219.

{¶17} Carter confirmed that he had set up a meeting with Robert to give back the property at Noble School. When Carter arrived at Noble School he saw police officers and decided not to meet with Robert. Carter then testified that he called Robert again and made the arrangement to meet Robert at his house. When Carter arrived, Robert helped him retrieve his property from Carter's trunk. Robert promptly thanked Carter and handed him his reward money. Subsequently, police officers arrived at Carter's residence and took him to the police station. At the police station, Carter denied having any involvement in the residential burglary and denied knowing who did do it. Carter testified that from the beginning of the interview, Detective Horn would not believe anything Carter would say.

{¶18} On cross-examination, the State elicited testimony regarding changes in Carter's story as follows:

> Q. Now, during this interview that you had with the officers, didn't you tell the police that you found the property at John Smith's house?
>
> A: No.
>
> Q: Didn't you also tell the police that you found it in your basement?
>
> A: Well, I'll tell you what happened. When it came to me about going to jail, he [Detective Horn] was like, "Well, if you don't want to tell me where it was, then you can just go to jail, you know,"

because the main time, the whole thing he just wanted to know who did the burglary.

Trial Tr., p. 224. Carter was unable to explain how the safe and purse were not muddy or wet when he found the items outside during rainy and snowy weather. It was also elicited on cross-examination that Carter has prior convictions for theft and for misusing credit cards.

{¶19} After Carter testified, the defense rested its case. The State then called Detective Horn back to the stand as a rebuttal witness. The State played portions of the police interview of Carter. In the beginning of the interview, Carter said that he found the Smiths' property while he was walking his dog down by the river. A few minutes later, Carter changed his story and said that he found the Smiths' property at John Smith's house while he was fishing. When asked whether Carter ever advised Robert to install a security system, Carter denied making that statement but did admit he told Robert he should get a shotgun. Carter appeared to be restless and fidgety throughout the entire interview.

{¶20} The State then offered the letter that was found in Michelle's purse into evidence. The note reads:

> I and my wife would like to ask the person or persons that borrowed my wife's rosary to return it. The rosary was removed from her unlocked car over the Valentine weekend. The rosary is a favorite that my wife received from a very close friend and is used weekly at adoration. We believe that a rosary can be a powerful tool to assist others in need and hope that it will be returned. We would gladly provide the person that borrowed the rosary a new rosary for their personal use if they would return it. We are not looking for any type

of retribution and do not intend to press charges or file a report. Obviously the person that borrowed the rosary was in dire need.

Bob and Shelly Smith
32 Hall Street
Tiffin

(State's Exhibit 10).

{¶21} On January 18, 2013, the jury returned their verdict. The jury found Carter guilty of one count of theft. The jury also found that the property involved was not a credit card. Consequently, the verdict resulted in a conviction of a misdemeanor in the first degree. The matter proceeded to sentencing on January 28, 2013. The trial court sentenced Carter to a jail term of 170 days. In addition, the trial court required Carter to pay restitution in the amount of $70.00 dollars to the Smiths.

{¶22} Carter filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING APPELLANT'S MOTIONS (sic) FOR ACQUITTAL AT THE END OF THE STATE'S EVIDENCE, AS THE EVIDENCE PRESENTED WAS INSUFFICIENT FOR A CONVICTION.**

*Assignment of Error No. II*

**THE JURY VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. I*

**{¶23}** In his first assignment of error, Carter contends that the trial court erred when it did not grant his motion for acquittal. Specifically, Carter argues that the State did not show that he threatened or intimidated the Smiths; therefore, failing to prove an essential element beyond a reasonable doubt. We disagree.

*Standard of Review*

**{¶24}** Crim.R. 29(A) provides that a court must order the entry of a judgment of acquittal of a charged offense "if the evidence is insufficient to sustain a conviction of such offense[.]" However, "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman,* 55 Ohio St.2d 261 (1978), syllabus. Thus, a motion for acquittal tests the sufficiency of the evidence. *State v. Tatum,* 3d Dist. Seneca No. 13–10–18, 2011–Ohio–3005, ¶ 43, citing *State v. Miley,* 114 Ohio App.3d 738, 742 (4th Dist.1996).

**{¶25}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47. Sufficiency is a test of adequacy. *State v.*

*Thompkins,* 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

{¶26} In order to preserve the issue of sufficiency on appeal, this court has held that "[w]hen a defendant moves for acquittal at the close of the state's evidence and that motion is denied, the defendant waives any error which might have occurred in overruling the motion by proceeding to introduce evidence in his or her defense. In order to preserve a sufficiency of the evidence challenge on appeal once a defendant elects to present evidence on his behalf, the defendant must renew his Crim.R. 29 motion at the close of all the evidence." (Citation omitted.) *State v. Edwards,* 3d Dist. Marion No. 9–03–63, 2004–Ohio–4015, ¶ 6.

{¶27} The record reveals that Carter made his Crim.R. 29 motion at the close of the State's case-in-chief, and that the trial court denied his motion for acquittal. Thereafter, Carter proceeded to present evidence in his defense. Carter, however, did not renew his Crim.R. 29 motion at close of his case-in-chief or at the conclusion of the all the evidence. Thus, according to this court's precedent, Carter has waived all but plain error. *State v. Flory,* 3d Dist. Van Wert No. 15–04–18, 2005–Ohio–2251, citing *Edwards.*

**{¶28}** However, "[w]hether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic." *Perrysburg v. Miller,* 153 Ohio App.3d 665, 2003–Ohio–4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891 (July 14, 2000). Regardless of the standard used, "a conviction based on legally insufficient evidence constitutes a denial of due process, and constitutes a manifest injustice." (Citation omitted.) *Thompkins,* 78 Ohio St.3d at 386–87. Accordingly, we will proceed to determine whether the State presented sufficient evidence to support Carter's conviction.

*R.C. 2913.02(A)(1), (B)(2)*

**{¶29}** Carter was charged with theft in violation of R.C. 2913.02(A)(1), (B)(2) which provides:

> (A)    No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1)    Without the consent of the owner or person authorized to give consent;
>
> * * *
>
> (B) (2) Except as otherwise provided in this division or division (B)(3), (4), (5), (6), (7), or (8) of this section, a violation of this section is petty theft, a misdemeanor of the first degree. If the value of the property or services stolen is one thousand dollars or more and is less than seven thousand five hundred dollars or if the property stolen is any of the property listed in section 2913.71 of the Revised Code, a violation of this section is theft, a felony of the fifth degree.

Further, "deprive" is defined as withholding property "with the purpose to restore it only upon payment of a reward or other consideration." R.C. 2913.01(C)(1).

*Recapitulation of Evidence*

**{¶30}** Bearing this statutory language in mind, we turn our attention to the evidence presented at trial. The record reveals that the State presented sufficient evidence to overcome Carter's motion for acquittal.

**{¶31}** Testimony was elicited from Robert that his house was broken into on April 26, 2012 and that a purse and small safe was taken from his home. On April 30, 2012, Robert received a phone call, from Carter, informing Robert that he had found his stolen property. According to Robert, Carter wanted a reward for finding the property. Robert testified that he informed Carter that he never intended to offer a reward for the missing property and asked Carter to return the property to the Tiffin Police Department, but Carter refused. Carter also refused to return the property to a nearby church. Instead, Carter only agreed to return the property if he met with Robert and received $70.00 as a reward.

**{¶32}** There was also testimony that Robert and Michelle had never given permission to Carter to possess their property. Michelle testified that she kept various credit cards inside of her purse. Further, the Detectives who worked on the case testified that Carter kept changing his story when they interviewed him. There was testimony that Carter lied about how much Robert gave him as a

"reward" and also gave multiple, contradicting stories about where Carter found the Smiths' property.

{¶33} However, there was testimony from Robert that inside of Michelle's purse was a paper that said "return for reward." Robert explained that it was a letter to the editor of a local newspaper concerning an unrelated theft of Michelle's rosary. When Michelle testified, she clarified that the paper in her purse did not say "return for reward," as her husband testified, but merely offered to exchange the stolen rosary for a new one, as the stolen rosary had sentimental value to her.

{¶34} Construing the evidence in a light most favorable to the prosecution, we find that there was sufficient evidence for a trier of fact to find, beyond a reasonable doubt, that the State proved the essential elements of theft.

{¶35} Carter contends that "no good deed goes unpunished" and that his discussion with Robert about a reward does not prove the element of deprivation that is required by R.C. 2913.02(A)(1). Appellant's Br., p. 4. To the contrary, deprive is specifically defined by R.C. 2913.01(C)(1) as withholding property "with the purpose to restore it *only* upon payment of a reward or consideration." (Emphasis added.) The State's evidence showed exactly what R.C. 2913.02(A)(1) prohibits. Robert testified he informed Carter that he was not offering a reward and to return the stolen property to the police department. Carter refused this request, and also refused to return the property to a nearby church. After refusing to return the property without a reward, Robert gave into Carter's demand and

-14-

offered him $50.00 to return his stolen property. Carter once again refused, and asked for more money. Carter continuously refused to return the Smiths' property without a reward and then had the audacity to negotiate a price for its return. This does not constitute a "good deed" but is a deprivation of property.

{¶36} Carter also argues that the State did not prove that Carter threatened or intimidated the Smiths. However, the existence of any purported threats or intimidation is immaterial to Carter's liability under R.C. 2913.02(A)(1). The statute merely requires that an offender knowingly exert control over another's property with the purpose of depriving the victim of his or her property, without the consent of the owner. As such, by its plain terms, R.C. 2913.02(A)(1) does not require threats or intimidation.

{¶37} Accordingly, we overrule Carter's first assignment of error.

*Assignment of Error No. II*

{¶38} In his second assignment of error, Carter argues that his theft conviction was against the manifest weight of the evidence. We disagree.

*Standard of Review*

{¶39} When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and

"created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

*Evidence at Trial*

{¶40} In addition to the State's case-in-chief, Carter took the stand to testify in his defense. On direct examination, Carter testified that he never demanded a reward, but that the letter he found inside Michelle's purse offered a reward. Carter also testified he was not interested in keeping the Smiths' property, and it was always his intention to give the property back to its owner.

{¶41} On cross-examination, Carter admitted that he was previously convicted of theft and misusing credit cards, both of which are crimes of dishonesty. Further Carter denied ever changing his story to Detective Horn or Detective Bour about where he found the Smiths' property.

{¶42} The State recalled Detective Horn to the stand as a rebuttal witness. On direct examination, Detective Horn played portions of his interview with Carter, which showed Carter changing his story multiple times throughout the interview. Detective Horn also testified that he collected the letter found in

Michelle's purse regarding the stolen rosary. Then State subsequently offered the letter into evidence as State's Exhibit 10.

**{¶43}** Carter argues that the State presented no evidence that Carter demanded a reward and the fact he changed his story so many times was irrelevant. Whether a reward was offered or demanded depends on whether the jury found Robert's or Carter's testimony more credible. Therefore, Carter's variations in his story were extremely relevant as they affect his credibility. Robert testified that he told Carter he did not originally plan on giving a reward for the return of his stolen property. Further, Robert asked Carter to return the property to the Tiffin Police Department as it was evidence in an ongoing burglary investigation. Carter refused this request, and also refused to return the property to a nearby church. It was reasonable for the jury to believe that Robert wanted his property back, which included not only credit cards and money, but also pictures of his deceased daughter, and gave into Carter's demand to issue a "reward."

**{¶44}** It is also telling how originally Robert offered $50.00 for Carter to return the property, and then Carter made a counter offer of $70.00. This demonstrates that Carter was not willing to give back the stolen property as part of a good deed, but was motivated by financial gain.

**{¶45}** Carter insists that he was offered a reward by the Smiths and simply accepted that reward. He testified he did not want the police involved because he

was afraid the police would think he was the one who burglarized the Smiths' residence.

**{¶46}** Even though Robert admitted to lying to Carter about not involving the police, it is reasonable that the jury believed the testimony of Robert over the testimony of Carter. On cross-examination, Carter testified that he never told the detectives that he found the Smiths' property at John Smith's house. However, this was contradicted when the State played portions of the interview recording for the jury, which showed Carter telling the detectives that he found the stolen property at John Smith's house. Carter was also unable to explain how the safe and purse were not wet or muddy when he found them outside during rainy and snowy weather. Carter's credibility was again called into question when he admitted on cross-examination that he has previous theft and misusing credit cards convictions, which suggest a dishonest propensity.

**{¶47}** Lastly, looking at the letter itself, there is no mention of a reward anywhere within it. Rather than offering a monetary reward, it simply states that the person who returns the rosary will receive another one from the Smiths. Considering all of the evidence in the record, it seems likely that Carter demanded a reward and was unwilling to return the Smiths' property unless he was monetarily compensated. Therefore, we cannot say the jury lost its way in finding Carter guilty of theft.

**{¶48}** Accordingly, we overrule Carter's second assignment of error.

**{¶49}** Having found no error prejudicial to Carter in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**
**/hlo**