[Cite as *State v. Lawson*, 2019-Ohio-2526.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                    :

                                              No. 18AP-355

v.                                               :       (C.P.C. No. 17CR-6887)

Isiah D. Lawson,                                 :       (REGULAR CALENDAR)

    Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on June 25, 2019

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Anzelmo Law, and James A. Anzelmo*, for appellant. **Argued:** *James A. Anzelmo.*

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Isiah D. Lawson, appeals a judgment of the Franklin County Court of Common Pleas entered on April 24, 2018 following a jury trial, convicting him of aggravated robbery as an aider and abettor with a firearm specification and sentencing him to serve a seven-year term of imprisonment. We find that the trial court did not abuse its discretion in admitting a text message constituting a communication just before the crime between Lawson and a person with whom he was allegedly complicit. We further find that Lawson's conviction was sufficiently supported by the evidence at trial and not against the manifest weight of the evidence. However, because the trial court committed an apparent clerical error in stating in its judgment entry that Lawson's sentence was mandatory, we remand for the issuance of a nunc pro tunc entry. We otherwise affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   On December 21, 2017, a Franklin County Grand Jury indicted Lawson for aggravated robbery, and two counts of robbery (one a second-degree felony and one a third-degree felony), each with an associated three-year firearm specification.   (Dec. 21, 2017 Indictment at 1-2.)   Lawson pled "not guilty" and the court held a jury trial[1] on the matter. (Dec. 26, 2017 Plea Form.)

{¶ 3}   At the trial, one of Lawson's victims, Ashley Householder, testified first.  She related that in October 2017 she wanted to buy a used cellular phone (a Samsung Galaxy S8+) and found several for sale through Facebook Marketplace (an online listing service). (Tr. at 201-04.)  She sent messages to some of the individuals who were attempting to sell S8+ phones, but only one seller responded to her inquiries, an individual whose Facebook profile identified him as "Ceo Lawson."  (Tr. at 204.)  Householder and Lawson shared a text message discussion about the availability of the phone and initially agreed on a price of $300 for the phone.  (Tr. at 206; State's Exs. B1-B13.)  After further discussion, the two ultimately agreed that Householder would pay $400 for both the phone and an iPad 2.  (Tr. at 208.)  Lawson invited Householder to meet him at a business on Livingston Avenue to consummate the sale, but Householder declined because that area of town was not an area in which she felt comfortable meeting.  (Tr. at 206-07.)  Lawson agreed to instead meet at Householder's suggested exchange point, a gas station on the corner of U.S. Route 33 and Petzinger Road between 7:00 and 8:00 p.m.  (Tr. at 207, 210.)

{¶ 4}   Householder said that she and her fiancé, Corey Mitchell, went to the gas station at the appointed time (which was after dark) and parked under a light in the gas station lot.  (Tr. at 211-12, 225.)   Because Lawson had not yet arrived, Mitchell and Householder got out of their car, bought some snacks at the gas station, and waited for Lawson near their car.  (Tr. at 213, 227.)  After a time, Lawson arrived driving an SUV; he backed in, leaving a parking space between the cars.  (Tr. at 211-12, 226.)  In the SUV with Lawson were a female passenger in the front and a male passenger in the back.  (Tr. at 213.) Instead of showing Householder the phone or iPad, Lawson engaged in casual conversation, indicating that it was his birthday and pausing several times during the

---

[1] A transcript of the trial and sentencing was filed on June 25, 2018 in two consecutively paginated volumes. In light of the consecutive pagination, we cite the transcript solely by page number.  Our account here is of witness testimony as the jury reasonably could have understood it.

conversation to send and review text messages on his phone. *Id.* After several minutes of this activity and requests to see the merchandise, Lawson retrieved a black book bag from the center console, placed it on his lap, unzipped it, but did not take anything out. (Tr. at 214-15.) At that point, Householder noticed the man in the back seat was moving around a good deal and seemed jumpy. (Tr. at 214.) When the man in the back seat got out of the SUV suddenly, both she and her fiancé stepped back, but the man indicated there was no reason to be nervous or scared and walked to the gas station convenience store. (Tr. at 215-16.) After stepping through the door of the convenience store, however, he quickly circled back, grabbed Householder from behind, and pressed what she believed was a gun to her lower back. (Tr. at 217.) "Where's the money, ma'am? Where's the money?" he inquired. *Id.* Mitchell, who was holding the $400 for Householder, gave the money to Lawson. (Tr. at 218.) After Lawson received the money, the presumed gun-wielder shoved Householder toward Mitchell, hopped in the still open door of the SUV, and Lawson, and his passengers sped away on Route 33. *Id.*

{¶ 5} Though Householder and Mitchell left the scene before the police arrived due to Householder being too distressed to stay, she and Mitchell did follow up with the police the Monday following the Thursday robbery. (Tr. at 220-23.) Approximately one month later, on November 15, 2017, the police showed Householder a photo array containing Lawson's photograph and she identified him as the driver of the SUV involved in the robbery. (Tr. at 231-33; State's Exs. E1-E2.)

{¶ 6} Mitchell also testified and recounted the same events with some relatively minor differences. (Tr. at 257-80.) He confirmed that Householder had given him the money to hold and that soon after Lawson arrived they approached and asked him for the phone. (Tr. at 263.) He elaborated that he handed Lawson a SIM card through the SUV window to put in the phone to see if it worked and said it was at that point that Lawson picked up the black bag. (Tr. at 265-66.) Mitchell explained that Lawson fiddled with the bag for a bit before handing the SIM card back and announcing that an adapter was needed to make it fit the phone. *Id.* Mitchell said he never saw the contents of the bag and that after returning the SIM card, Lawson began to drive away and he and Householder started to retreat to their own vehicle. (Tr. at 267.) However, Lawson then reversed back into the space. *Id.* Mitchell again asked to see the phone but Lawson, after asking them to approach,

did not answer the question about the phone and busied himself with texting. (Tr. at 269.) The man in the back seat seemed to be fidgeting with something and staring at them, but Mitchell could not tell what it was. (Tr. at 267, 269.)

{¶ 7} Mitchell testified that it was at this point, that he began to feel that something was not right but was not sure whether he and Householder could get away given that Lawson's car was running while theirs was off and locked. (Tr. at 269-70.) Lawson then unlocked the doors of the SUV by pressing the unlock button and the backseat passenger jumped out. (Tr. at 270.) The sudden appearance of the passenger caused both Mitchell and Householder to recoil, but the passenger said there was no reason to be scared and walked away toward the convenience store. (Tr. at 270-71.) When he did, Mitchell turned his attention back to Lawson and again asked for the phone which, again, was not produced; Lawson instead ignored him and continued texting. *Id.*

{¶ 8} Unseen by Mitchell, however, the backseat passenger returned, approaching quickly from behind, grabbing Householder, and pulling her toward the SUV. (Tr. at 272.) Although Mitchell did not see a gun or other weapon, as the robber gripped Householder's shoulder, his other arm was cocked such that it appeared he was holding something to Householder's back. (Tr. at 272-73.) When he demanded money, Householder indicated she did not have it. (Tr. at 272.) Mitchell did, however, and produced it. *Id.* The robber ordered Mitchell to give it to Lawson. *Id.* When he complied, the robber threw Householder toward Mitchell, then hopped in the SUV, which drove away. (Tr. at 274.)

{¶ 9} Mitchell confirmed that he and Householder did not stay at the gas station because Householder was very upset. (Tr. at 274-75.) However, they followed up with the police and he selected Lawson from a photographic lineup as the driver. (Tr. at 275-78; State's Exs. F1-F2.) According to Mitchell, Lawson did not say anything in the robbery or protest in any way. (Tr. at 279.)

{¶ 10} A number of witnesses testified to corroborating details, including the clerk of the gas station who witnessed Householder's hysterical demeanor following the robbery, the "blind administrator" of the photographic lineup who confirmed the process that was followed in administering the lineup, and a detective who photographed the SUV in which Lawson was eventually arrested. (Tr. at 302-03, 311-13, 325-34.)

{¶ 11} A substantive witness, a detective with the robbery unit of the Columbus Police Department, confirmed that Mitchell and Householder identified Lawson and that Lawson was ultimately arrested in the SUV used during the robbery. (Tr. at 353-61, 367-68.) The detective testified that Lawson was frank in admitting that a robbery had occurred and agreed with most of what the victims had recounted. (Tr. at 376-78.) The only substantive difference, said the detective, was that Lawson alleged that the robber (who Lawson knew through rap music business as "Streetz") took him hostage, holding the gun to his head, in order to force him to drive away from the scene. (Tr. at 376-79.) Lawson claimed he had not come forward about what happened because he feared Streetz. (Tr. at 380.) The detective agreed that Lawson gave information about a prior arrest of Streetz in Whitehall through which the detective was able to obtain Streetz' real name and that Lawson identified a photograph of Streetz. (Tr. at 386-89.) The detective also testified that Lawson denied communicating with Streetz after the October 12, 2017 robbery involving Householder and Mitchell. (Tr. at 379-80, 394.)

{¶ 12} In connection with testimony of a detective expert in digital forensics, the prosecution sought to introduce several pages of text messages between Lawson and someone identifying himself as "Streetz," that were recovered from Lawson's phone after his arrest. (Tr. at 413-24.) The trial court excluded the bulk of these text messages as being substantially more prejudicial than probative, as they concerned other vague plans with Streetz after the robbery that would require a gun. *Id.* However, the trial court did permit into evidence one text message from Lawson's phone timed approximately four minutes after Householder agreed to buy Lawson's electronics for $400. *Compare* Tr. at 436 *and* State's Ex. H8 *with* State's Ex. B11. The message read, "Call me streetz." (State's Ex. H8.)

{¶ 13} During closing, the State argued that Lawson, although not the principal offender in the armed robbery, was equally culpable as an aider and abettor of Streetz. (Tr. at 467.) The trial court also instructed the jury on liability as a complicitor or an aider and abettor. (Tr. at 513-15.) After deliberation, the jury found Lawson guilty of all counts and specifications in the indictment. (Tr. at 532-34.)

{¶ 14} At sentencing, the prosecution and defense agreed that the counts and specifications merged and the prosecution elected to proceed on aggravated robbery (Count 1) and the associated specification. (Tr. at 538, 541.) The trial court sentenced Lawson to

serve four years for the aggravated robbery and three consecutive years for the firearm specification. (Tr. at 545.) No mention was made of mandatory sentences during the oral imposition of sentence, but when the trial court's judgment entry issued, it indicated that a prison sentence was "mandatory pursuant to R.C. 2929.13(F)" in Lawson's case. (Apr. 24, 2018 Jgmt. Entry at 1.)

{¶ 15} Lawson now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Lawson assigns four alleged errors for review:

[1.] The trial court abused its discretion by admitting into evidence an irrelevant, vague and prejudicial text message from Lawson, in violation of his rights to a Fair Trial and Due Process guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 1, 10 and 16, Article I of the Ohio Constitution.

[2.] There is insufficient evidence behind the jury's finding of guilt against Lawson, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.

[3.] The jury's guilty finding against Lawson is against the manifest weight of the evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.

[4.] The trial court erred by finding that a prison term was mandatory for Lawson's aggravated robbery conviction.

## III. DISCUSSION

### A. First Assignment of Error – Whether the Trial Court Erred in Admitting the "Call me streetz" Text Message into Evidence

{¶ 17} Generally, "[t]he admission of evidence is within the discretion of the trial court." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 36, citing *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38. "Evidentiary determinations 'often require implicit determinations about facts (such as preliminary determinations of who said what in what circumstances)' and such determinations and the conclusions flowing from them are entitled to deference." *Shaw v. Underwood*, 10th Dist. No. 16AP-605, 2017-Ohio-845, ¶ 25, quoting *JPMorgan Chase*

*Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18.  "Yet, an abject failure to apply the relevant rule or state the rule correctly will still be an abuse of discretion because 'no court has the authority, within its discretion, to commit an error of law.' " *Shaw* at ¶ 25, quoting *Liggins* at ¶ 18; *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7, citing *Pontius v. Riverside Radiology & Interventional Assocs.*, 10th Dist. No. 15AP-906, 2016-Ohio-1515, ¶ 23-24; *State v. Beechler*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, ¶ 70.

{¶ 18}  The trial court found that the text message from near the time of the robbery saying "Call me streetz" was potentially relevant if foundation could be established while the other text messages, which concerned other vague potentially bad acts days after the robbery, were more prejudicial than probative.  (Tr. at 417-20.)  After laying the foundation for the expert detective to testify about texts recovered from Lawson's phone, who the texts were from, and when they were received and opened, the prosecution was permitted over objection to introduce the "Call me streetz" text.  (Tr. at 420-36.)

{¶ 19}  " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  Here, the trial court apparently found it relevant that Streetz and Lawson may have communicated by telephone shortly before the robbery.  We do not find this to be error.  The fact that the text message indicates that some communication may have occurred shortly before the robbery makes it slightly "more probable" that Streetz and Lawson discussed and planned the robbery than not had there been no such evidence of communication between the two before the robbery.  While the evidence was of limited relevance, unlike the other text messages it was not evidence of other bad acts or unfairly prejudicial.  The trial court did not err in admitting it.

{¶ 20}  Lawson's first assignment of error is overruled.

**B. Second and Third Assignments of Error – Whether Lawson's Conviction for Aggravated Robbery with a Firearm Specification was Sufficiently Supported or Against the Manifest Weight of the Evidence**

{¶ 21} In his second and third assignments of error, Lawson alleges that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.  The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are

'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990).  In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 22} In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433.  "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 23} As potentially relevant in this case, aggravated robbery is defined by the following prohibition:

(A) No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

R.C. 2911.01(A)(1). " 'Deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). The mental state for aggravated robbery is "knowingly" as to the theft component, and is strict liability as to the "deadly weapon" component. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, ¶ 40, citing *State v. Lester*, 123 Ohio St.3d 396, 2009-Ohio-4225; *State v. Wharf*, 86 Ohio St.3d 375, 377, fn. 1 (1999), quoting R.C. 2913.02(A).

{¶ 24} A three-year mandatory firearm specification may be imposed where "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A). In deciding whether a firearm has been used to commit the crime, "the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 25} Complicity is defined in relevant part as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

* * *

(2) Aid or abet another in committing the offense;

* * *

(E) It is an affirmative defense to a charge under this section that, prior to the commission of or attempt to commit the offense, the actor terminated his complicity, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose.

> **(F)** Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender.

R.C. 2923.03.

{¶ 26} No one disputes in this case that Streetz, by physically restraining Householder in such a way he was able to place his arm behind her back and threaten her life with what she believed to be a gun and demand money from her and her fiancé, committed aggravated robbery with a firearm. Nor is there any dispute that Lawson aided Streetz in the commission of the offense by driving him to and from the robbery and holding the money that Mitchell gave to him. The argument Lawson presented at trial and which he now presses on appeal, is that the prosecution simply failed to show that he was anything other than a bystander, third victim, or, at most, an unwitting participant in the offense. (Lawson's Brief at 10-14.) In essence, Lawson claims that he did not "knowingly" aid in the aggravated robbery or underlying theft.

{¶ 27} Yet, both Householder and Mitchell testified that Lawson brought Streetz to the "sale." (Tr. at 211-13, 263-64.) Despite being repeatedly asked by Householder and Mitchell, Lawson never showed or produced the goods that he had supposedly arrived to sell. (Tr. at 255, 271.) It was Lawson who unlocked the door for Streetz so he could leave the SUV. (Tr. at 270.) Lawson took the money that Mitchell handed to him while Streetz physically restrained Householder with what she believed to be a gun in her back. (Tr. at 217-18, 272-74.) Then, when Streetz, jumped back into the SUV through its open door, Lawson sped away. *Id.* Moreover, he never reported the crime until after his arrest over two months later when, for the first time, he alleged that Streetz had forced him at gunpoint to aid in the escape. (Tr. at 376-80.) Viewing the evidence in a light most favorable to the prosecution, as we are required to, we find these circumstances sufficient for the jury to have concluded beyond a reasonable doubt that Lawson knowingly aided in the aggravated robbery with a firearm.

{¶ 28} We recognize that the detective who interviewed Lawson testified that Lawson readily admitted that a robbery had occurred, indicated that he had been coerced into helping, and he had aided the police in identifying Streetz. (Tr. at 376-90.) Based on the trial evidence, Lawson apparently used his real last name and picture on the Facebook profile where the phone was listed for "sale." (State's Exs. B1-B13.) These actions are

consistent with innocence and could lend some credibility to Lawson's story about Streetz' surprise robbery and Lawson's coerced participation. But these actions are also consistent, respectively, with an attempt to earn leniency and a lack of criminal acumen that would permit the jury's judgment on Lawson's prior knowledge of the crime. Regardless, they are not weighty enough to support any conclusion that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 29} We overrule Lawson's second and third assignments of error.

### C. Fourth Assignment of Error – Whether the Trial Court Erred when it Found Lawson's Sentence to be Mandatory in its Judgment Entry

{¶ 30} Lawson alleges, and the State concedes, that the trial court erred when it included language in its judgment entry to the effect that Lawson's sentence was "mandatory pursuant to R.C. 2929.13(F)." (Apr. 24, 2018 Jgmt. Entry at 1; Lawson's Brief at 15-17; State's Brief at 15-16.) Because we agree that none of the many circumstances in which R.C. 2929.13(F) can render a sentence mandatory and incapable of reduction apply in this case, we sustain this assignment of error. We also agree that, as the trial court did not impose a mandatory sentence orally or consider whether Lawson had the sort of criminal past that would have made him subject to R.C. 2929.13(F)(6) on conviction for a first-degree felony, the trial court's error appears to have been merely clerical in producing the judgment entry. Accordingly, we remand for the trial court to issue a nunc pro tunc entry restating the sentence and indicating that it is not mandatory.

## IV. CONCLUSION

{¶ 31} The text message at issue was relevant in that it made the possibility of collusion between Lawson and Streetz more probable. There is no indication this text message was unfairly prejudicial and the trial court did not abuse its discretion in admitting it. Lawson's first assignment of error is overruled. Because Lawson's conviction as an aider and abettor was sufficiently supported by the evidence at trial and was not against the manifest weight of the evidence, we also overrule his second and third assignments of error. Finally, because the trial court committed an apparent clerical error in stating in its judgment entry that Lawson's sentence was mandatory, we sustain Lawson's fourth

assignment of error and remand for the Franklin County Court of Common Pleas to issue a nunc pro tunc entry correcting the error.

*Judgment affirmed in part,*
*reversed in part, and remanded*
*for the issuance of a nunc pro tunc entry.*

BROWN and NELSON, JJ., concur.